IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2025

## CLAY STUART GREGORY v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Humphreys County**
**No. 13006    Larry J. Wallace, Judge**

_____

### No. M2023-01502-CCA-R3-PC

_____

The Petitioner, Clay Stuart Gregory, was convicted of aggravated robbery, first-degree felony murder, and premeditated first-degree murder, for which he received an effective sentence of life in prison. State v. Gregory, No. M2012-00546-CCA-R3-CD, 2013 WL 6187919, at *1 (Tenn. Crim. App. Nov. 25, 2013), perm app. denied (Tenn. May 14, 2014). The Petitioner subsequently filed a petition seeking post-conviction relief, which was denied. In this appeal, the Petitioner argues he received ineffective assistance of counsel based on the following nine grounds: (1) trial counsel's failure to lodge a pretrial objection to a note found in the Petitioner's truck and the failure of the post-conviction court to permit juror testimony under Rule 606(b) regarding the impact of the same; (2) trial counsel's failure to object during the State's closing argument; (3) trial counsel's failure to prepare for trial; (4) trial counsel's failure to investigate, call, or cross-examine key witnesses; (5) trial counsel's failure to request a jury instruction pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999); (6) trial counsel's failure to present a shooting incident reconstruction and a firearms expert; (7) trial counsel's failure to ensure the Petitioner could hear during trial; (8) trial counsel's failure to secure the presence of the Petitioner and Jacqueline Peek for a court ordered deposition; and (9) trial counsel providing the jury with a report that contained inflammatory information about the Petitioner. The Petitioner also argues that trial counsel violated an ethical duty of loyalty by simultaneously representing the Petitioner and two potential defense witnesses. Finally, the Petitioner contends that he is entitled to relief based on the cumulative error doctrine.[1] Upon review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

Nicholas McGregor, Nashville, Tennessee (on appeal); Michael Flanagan, Nashville, Tennessee (at hearing), for the appellant, Clay Stuart Gregory.

---

[1] We have re-ordered the Petitioner's issues for clarity.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Lisa Donegan and Margaret F. Sagi, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

A full recitation of the facts supporting the Petitioner's convictions may be found in our direct opinion at State v. Gregory, No. M2012-00546-CCA-R3-CD, 2013 WL 6187919, at *1. On November 26, 2009, Eddie Lucas, the victim in this case, was found in his home by his wife, Rachel Lucas, with two fatal gunshot wounds in his chest. Although Rachel Lucas did not see the Petitioner shoot the victim, she observed the Petitioner leaving her home after discovering her husband had been shot. She called 911 and identified the Petitioner as a suspect. The State's theory at trial was that the Petitioner killed the victim after discovering that he had been having a twenty-four-year affair with a woman whom the Petitioner intended to marry. The State established the Petitioner's guilt, in large part, based on the following: testimony of the victim's wife that she observed the Petitioner at her home before and shortly after hearing gunshots and finding her husband's body, testimony from several of the victim's neighbors confirming that they observed a truck similar to the Petitioner's in the victim's driveway during the early morning hours of the offense, testimony from one of the victim's neighbors identifying the Petitioner and his truck as being in the victim's driveway on the morning of the offense, testimony that the Petitioner had been seen with a gun before and after the offense, the Petitioner's DNA having been found on a marijuana cigarette discovered outside the victim's home on the morning of the offense, and a note that was recovered from the Petitioner's truck that had the victim's signature on it. In his direct appeal, the Petitioner challenged the sufficiency of the evidence, the denial of his motion to suppress the search of his truck, and the denial of his motion to recuse. This court affirmed the judgments of the trial court, and the Tennessee Supreme Court denied discretionary review on May 14, 2014.

On March 23, 2015, the Petitioner filed a pro se petition for post-conviction relief. On June 19, 2015, first counsel was appointed and subsequently moved to withdraw due to a conflict. On October 14, 2015, an order was entered allowing first counsel to withdraw and appointing second counsel. Second counsel filed the first amended petition on December 14, 2015. On March 7, 2016, a preliminary order was entered requiring the State to respond. On April 6, 2016, a second amended petition was filed, which appeared to be a combination of the pro se petition and the first amended petition. On April 28, 2016, the State filed its response, denying the allegations in the petition. On October 25, 2018, a notice of substitution of counsel was filed, and third counsel was shown as retained

by the Petitioner.  After extensive litigation, on May 10, 2021, a third amended petition was filed, incorporating the issues raised in the previous petitions.

**Post Conviction Hearing.**  On January 26, 2022, the post-conviction court conducted an evidentiary hearing.  Tennessee Bureau of Investigation (TBI) Special Agent Joe Craig, the lead investigator, testified that the TBI became involved in this case upon being contacted by Sheriff Chris Davis and that he partnered with the Humphreys County Sheriff's Office and the New Johnsonville Police Department.  Agent Craig took notes as part of his investigation, which were made an exhibit to the hearing.  In March 2011, he issued a subpoena for Jacqueline Peek to participate in a deposition.  Agent Craig maintained constant contact with the district attorney's office; however, he was unaware if a deposition for Jacqueline Peek had occurred.  He did not have any notes of a deposition occurring, and he did not attend one.  After being provided with his notes, Agent Craig agreed that he often made a "TBI IR" to codify an interview into an "IR."  He said that he had time to reflect upon his notes when he codifies an interview.  He denied that the TBI was biased in any way.  Based on the crime scene log, Agent Craig arrived at the Humphreys County crime scene at 11:50 a.m., and the first officer arrived at 9:10 a.m. Upon arrival, he coordinated with local law enforcement.  He considered his investigation in this case to be thorough.  He worked with John Ethridge from the district attorney's office.  He was present for the entire jury trial and provided truthful testimony.

Jacqueline Anne Peek testified that she knew the Petitioner, the victim, and Rachel Lucas before the offense.  Asked by post-conviction counsel if she had testified about this case in March 2011, Peek replied, "Yes."  She remembered being placed under oath, the presence of a court reporter, and the process being similar to the evidentiary hearing.  She did not recall which prosecutor was present, and she appeared under court order.  Post-conviction counsel noted that an order for Peek's deposition was a part of the trial record. On cross-examination, Peek agreed that she was involved in this case from the moment it occurred on November 26, 2009.  Before March 2011, she refused to be interviewed without the presence of her attorney.  An investigator showed up at her workplace, "intimidating" her, but she provided him with her attorney's name.  She spoke with trial counsel and accompanied the Petitioner when he visited trial counsel while the Petitioner was on bond, but she was "just more or less in the room."  She was the Petitioner's girlfriend at the time.  She mentioned a meeting during which she was questioned with trial counsel and prosecutors present; however, she could not recall the location of the meeting, who was there, or what they looked like.  She explained it was eleven years ago.  She recalled speaking with her attorney about the meeting, and he advised her to attend.  She could not recall the day of the meeting, but she stated it was not in the Hickman County jail.  Although she could not remember the details, she said, "I remember I was [at a deposition] and there were several men there and I believe a couple of females."  She could not recall how long ago the deposition occurred, but she believed it was "in a high[-]rise

[d]owntown Nashville."  Although she could not remember "a lot of the details," she believed a deposition occurred before the trial.

Upon further questioning by the court, she agreed that during the investigation it was "very traumatic," and she did not remember "a lot."  She was not comfortable being in court that day.  She also did not know how long the deposition was, but remembered it was in a "real big office with a really big conference table."  She clarified that she did not know who was present at the deposition, but stated it seemed like her attorney and "four or five of them" dressed in suits.  She said, "two or three of them" asked her questions.

Wayne Ellison, the Chief of Police for the New Johnsonville Police Department in 2009, testified that he was notified about this case by dispatch, responded to the scene of the Lucas home, and was familiar with the victim before the homicide.  Upon arrival, he observed Rachel Lucas standing at an island intermittently during the day.  He observed her washing something off or wiping something down.  He had not met Rachel Lucas before the homicide, and he acknowledged that he may have described her behavior as "flighty" or someone who "probably [had] a lot going on at one time."  His initial impression of her after the first interview was that she was sad.  He could not recall saying Rachel Lucas was "overdramatizing her description" of the Petitioner.  He explained she called the Petitioner a "monster" or "the monster."  On cross-examination, he agreed that Agent Craig was the lead investigator in this case, and that if he had seen anything unusual, he would have advised Agent Craig.  He agreed that he provided truthful testimony at the trial in this case.  He agreed that he also described Rachel Lucas as being in shock, and he would have advised Agent Craig if he believed Rachel Lucas was being disingenuous.  He did not believe her behavior was suspicious.

Dr. Linde Christine Rush-Burkey, a criminal justice professor at East Tennessee State University, testified as an expert in "forensic document examination."  She said her field included examining handwriting for comparison with known exemplars to determine whether the handwriting is authentic.  She said this area of expertise was available in 2009 and 2011.  Petitioner's counsel referred her to trial Exhibit 73, the note, and Exhibit 102, an enlargement of the note.[2]  Petitioner's counsel also referred to the trial court's limiting instructions to the jury, and Dr. Rush-Burkey agreed she had reviewed them.  Dr. Rush-Burkey agreed there were risks associated with allowing a lay person "in that setting to analyze a document for the writing but not the contents of the writing."  She said the "likelihood of an individual being able to look at a document and look at writing and not absorb[] the actual content would be very difficult to do[.]"  She agreed she did not know any of the jurors in this case and was unaware of their ability to absorb written content.

---

[2] As will be discussed more fully below, the record shows that Exhibit 102 was marked for identification purposes only at trial.

- 4 -

Her report, admitted as an exhibit, concluded that "lay persons should not have been permitted in a legal proceeding to make such judgments." She reasoned that, unlike trained forensic document examiners, laypeople lack the necessary education, and their error rates are significantly higher. She agreed she was being compensated for her involvement in this case; however, it would not influence her opinion. She would have been available to testify at the Petitioner's trial had trial counsel subpoenaed her, and her expert testimony would have been that the jurors would be unlikely to disregard the content of the note. She said there was an "increased danger" that a layperson would "absorb the contents" of the note the more time they spend with it.

On cross-examination, she clarified that the only documents she reviewed in this case were the judge's instructions to the jury. She was not aware that the State had provided defense counsel in discovery with a certified document examiner's handwriting analysis of the note. Nor was she aware there was another document examiner in this case. She did not review any of those documents or the note that was shown to the jury. She agreed that there was a potential for a person's spouse of thirty years to identify their spouse's handwriting, especially if they observed it every day. She agreed that her report noted that "research on the ability for juries to disregard certain information or evidence is somewhat mixed" and that there was no conclusive scientific proof that they would disregard the information. She acknowledged that her opinion was not widely accepted by the scientific community. She agreed that she had never had a <u>Daubert</u>[3] hearing regarding this issue. She agreed that there was no research to date addressing the ability to examine the questioned handwriting without absorbing the content. She agreed there had been no research supporting her theory and that it had not been scientifically proven.

Investigator John Ethridge with the district attorney general's office testified that he responded to the crime scene on the day of the offense. Photographs taken from the crime scene that were not admitted as exhibits at trial were shown to him, and he agreed he had taken them. The photographs, admitted as Exhibit 4A and B, showed a close-up view of a sconce on the floor of the victim's home and the victim's living room showing two drinking containers on the coffee table and a drink container on a table near a set of chairs. Exhibit 5 showed a series of photographs, including one of a red pencil on the floor and two angles of a blue pencil protruding from a sofa cushion. During cross-examination, Investigator Ethridge explained that his role in this case was to serve as the crime scene photographer and to assist Agent Craig. He also assisted trial counsel by taking him to the former home of the Peek family and explaining what he had found there. He agreed that he testified twice at trial and that his testimony was truthful. He was familiar with Jacqueline Peek, and he was not present at any depositions with her. Although he "read in a petition that

---

[3] <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

was filed in this case" that a deposition occurred in Hickman County, he had no personal knowledge that it had occurred.

Donald Dawson, a veteran defense attorney, testified as an expert in prosecution and defense closing arguments. The Petitioner hired Dawson, and he received $1650 to review the case. He denied that his compensation would affect his opinion. He compiled a report, which was admitted into evidence. Dawson determined that trial counsel failed to object to the State's first closing argument based on improper emotional appeals to the jury, witness vouching, and by injecting improper personal beliefs. Dawson identified seven references to Thanksgiving in the State's first closing that he considered to be improper emotional appeals to the jury because they were superfluous to the offense date.

For example, the State argued, "In a perfect world, somebody doesn't get killed on Thanksgiving," and "[W]hen she got up, she didn't smell the turkey cooking." Dawson opined that the repeated references to Thanksgiving throughout the first closing argument were beyond the scope of evidence and outside the evidence because the evidence was "clear that . . . she had made vegetable soup for Thanksgiving dinner and that's all they were having. They weren't having turkey that day. So there would be no reason to expect it." Dawson also stated that the State suggested Scott Dodd could not have been wrong about the Petitioner's truck by arguing that Dodd knew the truck because he had owned one like it. In Dawson's review of the testimony, neither Scott Dodd nor his wife said that he owned a truck like the Petitioner's. Dawson considered this comment to be improper witness vouching because it was used to bolster the witness's testimony. Finally, Dawson also stated that the State expressed personal beliefs as to the Petitioner's guilt or innocence by saying, "Ladies and Gentlemen of the Jury, I propose to you that what you've seen and heard evidence is sufficient for you to find the defendant Stuart Gregory guilty of everything he's charged with." Dawson considered this comment "close to the line" of giving one's own opinion as to the evidence.

Dawson opined that the State's rebuttal closing argument also improperly appealed for sympathy from the jurors by using a Thanksgiving narrative to emphasize the date the homicide occurred. Dawson pointed to the State's repeated references to what the offense has done to the families and that the victim will no longer be able to have Thanksgiving dinner. Dawson opines that the State's second closing was based on improper appeals to the emotions of the jurors. Specifically, the State referred to the testimony of Pam Gunn, and how he was "affected by her supposedly tearing up on the . . . witness stand and how that showed to him her credibility, which, again, is a type of vouching for the witness that's improper." Dawson said the State tried "to show his sense of outrage that [trial counsel] would suggest that it would be second degree [murder]," which was improperly giving his personal opinion to the jury. Dawson acknowledged that trial counsel's closing argument

- 6 -

invited a response; however, Dawson insisted that the State's display of outrage that the jury would even think to suggest it was a second degree was "going over the top."

Finally, Dawson said that trial counsel improperly commented on the fact that trial counsel was not going to object to the State's closing argument. Specifically, Dawson testified:

> I've known that to be pretty amazing. I don't think I've ever heard a defense -- I don't think I've ever read a transcript or heard in court a defense attorney essentially praising a prosecutor's closing argument and then explaining why he's not going to make any objections because of his friendship with the prosecutors and apparently a trust in the prosecutors and that they would share it with him. I'm -- it -- it was clearly -- I mean, at the -- I think the -- the rules of practice, the ABA standards, the -- are clear that closing arguments are a very important part of -- of the case, and it's not the time for a defense attorney to give up on protecting his client from improper actions by the prosecution.
>
> And basically, what he's telling the jury -- you know, if they go out of bounds and say something they shouldn't do, I'm just going to trust you to understand that and I'm not going to object. And I think that's what he did. He didn't object when he should have. So I found that to be abandoning his client and telling the jury he was abandoning his client.

Dawson opined that trial counsel's abandonment of the Petitioner and failure to object to the State's closing argument waived any errors on appeal. Dawson also said there was no "strategy" involved in trial counsel's failure to object and noted that trial counsel called the State's first argument "wonderful." He said trial counsel also told the jury of the importance of closing arguments. Dawson noted that trial counsel incorrectly told the jury that, regardless of what the State said in closing arguments, he (defense counsel) had no recourse except to listen. Dawson said that the judge could have fashioned a fair remedy if the State "opens new issues" or "the defense had not had a chance to reply." Dawson reviewed the limiting instruction provided to the jury by the judge regarding Exhibits 73 and 102. Dawson said that the rebuttal closing argument was an invitation to the jury to look at the contents of the note, which was contrary to the limiting instructions provided by the judge.

On cross-examination, Dawson agreed that closing arguments are to be reviewed on a "case-by-case" basis and that attorneys are "put on the spot" to synthesize a vast amount of information. He did not consult trial counsel on his choice of words during closing. He agreed that the State's first closing was "vastly" shorter than the rebuttal closing. He said

this was the "first clue" to determine if the rebuttal closing had gone beyond the first closing and defense closing. He noted that trial counsel's closing argument was 30 or 31 pages of transcript, while the State's rebuttal closing was 35 pages. Although Dawson was not retained to review trial counsel's trial performance, Dawson did not understand why trial counsel did not stipulate that the note was found in the truck and that the victim wrote it. Dawson reasoned that this would have prevented the note from being admitted into evidence. He acknowledged that jurors are given instructions to follow the rules of the court, including those regarding closing arguments, and that what an attorney says is not evidence. He did not talk with the State's attorneys to determine their mindset during the closing statement.

Dawson emphasized his conclusion that the State's repeated reference to Thanksgiving in their first closing statement was not to recall a date or memory but rather to appeal to the emotions of the jury. He agreed that the State argued facts and scientific evidence at the same time. He denied that his opinion was a commentary on the State's "style." He agreed that judging an appeal to emotion is a subjective inquiry; however, he explained that the prosecutors mentioned Thanksgiving in ways "designed to reach the heart of the jurors" and for them to decide the guilt or innocence of the Petitioner based on emotions associated with having their Thanksgiving disrupted. He agreed that the State's comment about a silver truck and the Dodds' may have been an oversight, rather than intentional. Although he considered it "excusable," it was still "improper." He also agreed that attorney misconduct may not result in a verdict being overturned. He said, "too few verdicts are overturned," and he admitted that he was slightly biased as a defense attorney. He confirmed his view that the State's first closing argument was "close to the line" but not misconduct. He agreed that trial counsel "did a fairly detailed closing with the proof in this case." He reviewed the inconsistencies in the testimony, which demonstrated that trial counsel was "paying attention" during the trial.

The Petitioner testified that he graduated from high school and attended courses at Middle Tennessee State University. He joined the military and was active in the Army for twenty-six years. At the time of his arrest in this case, he had no experience with the criminal justice system. He met trial counsel at the jail a day or two after the offense and described him as "a blessing." He said trial counsel visited him multiple times in jail and answered his questions. He said he had given trial counsel information about his case to investigate, and trial counsel told him he would investigate. The Petitioner later found out that it was "lip service" and that trial counsel did not follow through. He said his parents had hired a private investigator; however, he had only spoken with the investigator on the phone, without a personal meeting. He said trial counsel would tell him the investigator was working on something, but he never saw any written documentation. He said trial counsel told him that trial counsel did not reduce things to writing because the State may obtain access to it. He recalled that trial counsel told him the investigator had interviewed

someone, but nothing else was reported to him. He said that trial counsel did not inform him who was interviewed or the outcome of the investigation. He provided the name Dickie Jackson to trial counsel; however, trial counsel never explained why he was not interviewed. He was initially satisfied with his trial counsel; however, he said that when he wanted to discuss his case, trial counsel wanted to talk about Michelle Herbison.

There were times when the Petitioner expected trial counsel to visit him in jail, and trial counsel did not appear. The Friday before the June 2011 trial, trial counsel informed the Petitioner that he would be coming to Waverly to prepare for trial, but he never showed up. His trial was initially set in August 2010. Before the August 2010 trial date, trial counsel did not share any defense strategies with the Petitioner. Leading up to the August 2010 trial, trial counsel did not discuss with the Petitioner a continuance or a second mental health evaluation. The continuance of the August 2010 trial came as a surprise to the Petitioner. Between August 2010 and June 2011, there was no mental health evaluation, and the Petitioner did not see any mental health officials. Leading up to the June 2011 trial date, trial counsel did not discuss defense strategies with the Petitioner or provide a witness list. The Petitioner identified the individual witnesses on the list he was aware of before his June 2011 trial. The Petitioner said that trial counsel did not discuss any potential conflicts of interest with the witnesses, nor did he sign a conflict of interest waiver.

At trial, the Petitioner waived his right to testify in open court. He said trial counsel did not prepare him to testify at trial. The Petitioner stated that trial counsel requested an answer from him a week before the trial regarding whether he planned to testify at trial. The Petitioner said trial counsel did not explain any possible questions from the State, nor did trial counsel provide any prospective questions. The Petitioner was surprised that trial counsel requested a continuance of the June 2011 trial, as the jury was already seated and sworn. The Petitioner recalled that trial counsel requested a continuance and permission to withdraw from the case. The Petitioner said this was on his mind throughout the case. He was familiar with Jacqueline Peek; however, he did not attend any deposition. Based on the information trial counsel gave him, the Petitioner believed the judge had ordered a deposition. Trial counsel discussed Peek's anticipated testimony with the Petitioner before trial; however, the Petitioner did not recall the specifics.

The Petitioner has worn hearing aids since 2009, and he informed trial counsel that he required hearing assistance. In June 2011, he did not have hearing aids. He was provided with the hearing aids he wore at the instant hearing three years ago. He agreed that he had to alert the court to his inability to hear, and that it was frustrating to sit through the trial without his hearing aids. The Petitioner's medical records, which reflected the condition of his hearing, were admitted as an exhibit. He said his family could have paid for an expert to testify at trial if one was needed.

He agreed that on August 18, trial counsel wrote to him about a 30-day mental health evaluation for a patient; however, no such evaluation occurred. He agreed that he had a prior mental health evaluation in December 2009 or January 2010. Trial counsel wrote the Petitioner several other letters dated August 26, 2010, September 9, 2010, November 2, 2010, April 12, 2011, each indicating trial counsel had some development in the Petitioner's case. However, the Petitioner emphasized that trial counsel's words and his actions were two different things. He said trial counsel also wrote him a letter stating that talking with his brother-in-law was a waste of time, which caused the Petitioner to doubt trial counsel because he trusted his brother-in-law.

On cross-examination, the Petitioner agreed that trial counsel represented him since his arrest in this case. He met with trial counsel at his office while he was on bond, denied that trial counsel met with him regularly while he was in jail, and agreed that trial counsel met with him numerous times. He reiterated that trial counsel would say that he would do things in his case that would never materialize. When asked if he recalled the morning of trial, the Petitioner said yes, and referred to the June 2011 trial. In response to hearing the transcript being read, the Petitioner explained that he did not have the assistance of his hearing aids at the June 2011 trial and might not have understood clearly what was being said. He denied that trial counsel asked him to request a continuance, and he insisted on proceeding to trial that day. He insisted that he told trial counsel he could not hear. When reminded that he did not ask anyone to repeat something or advise anyone that he could not understand in court, the Petitioner said he did not do so at that time because he had told trial counsel. He said he had hearing problems during his motion to suppress, and the court accommodated him after several witnesses and voir dire. He insisted he told trial counsel he could not hear numerous times, and trial counsel did nothing in response.

The Petitioner agreed he received a letter from trial counsel regarding a deposition. He did not receive a letter from trial counsel indicating that there would not be a deposition because the witness had invoked her right to counsel. From his understanding of the letter, the witness's lawyer "blocked the deposition." Based on his conversations with Peek after the trial, he believed there was a deposition. He agreed that he had participated in a court-ordered competency evaluation and was deemed competent to stand trial. He said trial counsel discussed a mental health defense, but the Petitioner refused to agree with it. He clarified that trial counsel had discussed testifying at trial with him; however, trial counsel never reviewed the specific questions that would be asked during the trial. He agreed trial counsel discussed the legal ramifications of testifying at trial.

Upon questioning by the court, the Petitioner said he was issued hearing aids by the Army during his retirement physical in 2009. When he was arrested, he was not permitted to have his hearing aids in jail. He felt pressured by trial counsel to decide whether to testify, and he believed trial counsel tried to discourage him from testifying. The Petitioner

was dissatisfied with trial counsel because when the State concluded its case, trial counsel leaned over and said, "they haven't presented any evidence to convict you of anything. I'm not going to present a defense." The Petitioner was "shocked and surprised" because his family paid trial counsel "a lot" of money to represent him properly.

Dr. Lawrence Richard Jackson, the county medical examiner, testified that he visited the crime scene on November 26, 2009, nearly three hours after law enforcement personnel arrived. He agreed he had no formal training as a medical examiner; however, he was permitted to testify as an expert based on his experience in the field. Generally, as the county medical examiner, he opined that the body temperature of a victim was significant; however, he did not recall if he obtained the victim's body temperature in this case, and he did not prepare any reports. He could not recall if he brought a thermometer to the scene and stated that he did not generally carry a thermometer with him at that time in his career. He said a victim's body temperature was one factor in determining the time of death. He did not observe any defensive wounds on the victim in this case. He agreed that a lack of defensive wounds could indicate that the person was asleep, unconscious, or familiar with the attacker and did not feel the need to defend themselves. He stated that Rachel Lucas was present in the home when he arrived, that he heard her voice, and that he observed law enforcement attempting to "eavesdrop" on a telephone conversation she was having. He also thought Rachel Lucas's behavior was "a little strange" because she was not hysterical and upset at the scene.

On cross-examination, Dr. Jackson said other law enforcement and medical personnel were on the scene before his arrival, and it was possible that they could have moved the victim's body. He did not have any personal knowledge of whether the victim's body had been moved. He said if he had noticed something on the scene, he would have brought it to the attention of the investigators. He did not do an expert report to determine the time of death in this case. He said the manner of death was "obvious" gunshot wounds to the chest. Although he was asked about defensive wounds on direct examination, he agreed he did not conduct the autopsy, and he did not know if there was anything else on the victim's body. He maintained there were no apparent defensive wounds on the victim. Regarding Rachel Lucas's behavior, he agreed that people handle stressful situations differently, and he was not present during the entirety of her conversation with law enforcement. He had not heard the 911 call in this case.

Dr. Eric Warren, the co-owner and consultant for SEP Forensic Consultants, testified as an expert in crime scene reconstruction and firearm and tool marking. He was hired by the Petitioner's family and compensated for his involvement in this case. He said his compensation did not influence his conclusions in this case. He prepared a report, which was admitted as an exhibit. His report reflected that trial counsel did not call any expert witnesses at trial; therefore, the evidence presented at trial was one-sided. Based on

his review of the evidence, TBI Agent Brodhag was able to match four shot shells to the shotgun that was found in the Petitioner's truck. Although Dr. Warren implied that Agent Brodhag correctly analyzed the shells, Dr. Warren stated that the "significance of [Agent Brodhag's analysis] was not communicated at trial because of a lack of that defense expert." Although the shot shells "might match that shotgun" Dr. Warren said that there was no direct or scientific evidence of when and where that shotgun fired the shot shells. He said the characteristics of the shot shells found in this case were "the two most common sized pellets." This was not brought out at trial, which was significant because "these are the types of shot shells that are typically purchased for" sporting types of activities.

Dr. Warren reviewed photographs of the victim in this case and observed that he had been shot twice. He said there were 34 pellets recovered from the entire case, which was not enough to amount to one full gunshot. Although he expected to recover between 440 and 550 pellets from the two shots, he said it was not uncommon not to recover all of them. He said it was uncommon to receive such a small percentage in this case. He explained the pellets may not have been recovered because they were "missed, overlooked, or a decision was made at some point that they weren't . . . important to actually test." He agreed that a possible explanation for the low percentage of pellets was that one of the two gunshots occurred in a different location. He said that for the two gunshots in this case, there should have been six wads recovered; however, there were only four wads examined by Agent Brodhag.

Dr. Warren was shown photographs from the crime scene, depicting two silver cans, a water glass, a tumbler, and a sconce. He agreed those surfaces were amenable to fingerprint and DNA collection. When asked about the statement made by the State in rebuttal closing argument that the victim was writing a note when he was shot, Dr. Warren said there was no indication any scientific testing was done that would confirm the statement as true. In discussing the trajectories described by the medical examiner at trial, Dr. Warren said that if the victim were shot while he was writing on a table, there would be a downward trajectory. He said investigators should have measured the couch, the table in the room, and the trajectory of the pellets to determine the position of the victim's body. Dr. Warren was also critical of "a blue colored pencil" he observed in the crime scene photographs. He said at the time of the Petitioner's case, field agents were supplied with their own trajectory kits, and the use of a pencil was not appropriate to determine trajectory.

Dr. Warren said the use of the pencil also risked contamination of the scene with another person's DNA. He explained how to properly measure the trajectory of the bullet path given the position of the body and how to recreate the crime scene. He said that if the trajectory and reconstruction had been done correctly, investigators would be able to go back and position the body, and from that, determine what position the victim was in when the offense happened. He said there were crime scene preservation issues, including an

ink pen that was not tested, eleven people "in and out of the scene that were law enforcement," and Rachel Lucas was allowed to remain on the scene with unrestricted access to the home. In addition, photographs of Marker 27 showed that clothing had been displaced from its original position during the initial walk-through of the Lucas home.

On cross-examination, Dr. Warren agreed that it was discussed at trial that the shotgun recovered from the Petitioner's truck could not be matched with the pellets at the scene. He clarified that he did not dispute Agent Brodhag's ballistic findings in this case. He did not know if an officer was present with Rachel Lucas at the home, and he acknowledged that he was speculating about tampering with the scene. He agreed that he had no experience as a field agent.

Agent Joe Craig was recalled and testified on behalf of the State. Upon arrival, he observed that the Lucas home was a very large, split-level, ranch-style home. He said only law enforcement was permitted to enter the scene. Rachel Lucas was allowed to remain, and she was separated from the others. There were officers from the sheriff's department or the New Johnsonville Police Department who stayed with her. Agent Craig stated that after discussing the matter with another officer, he determined that the sconce that appeared to have been knocked off a wall was not directly involved in this case. There also did not appear to have been a scuffle in the area where the sconce was found. Agent Craig also did not recover the pen found on the floor by the table where the victim was found, and he could not recall why the pen was not recovered or collected. He agreed that the doorknobs were not fingerprinted or collected. Based on the time the investigators arrived, Agent Craig opined that the doorknobs had been touched by six or more people, which reduced the likelihood of developing touch DNA. Agent Craig reiterated that upon his arrival at the scene, he had a lead or a suspect, and the Petitioner was already in custody at another location.

Agent Craig collected various other items of evidence at the crime scene, which did not yield any scientific results. He recalled the medical examiner being present at the scene; however, he did not request him to perform a medical examination. He did not have a trajectory kit on the scene with him in 2009. He agreed the blue pencil shown near the couch was an attempt to show an entrance point of the shot wadding into the couch; however, he said he had no way of measuring the trajectory of the shotgun. He explained he would not request a trajectory on a shotgun based on his knowledge and experience working with firearms. He was aware of a deposition scheduled for Jacqueline Peek and contacted her at her workplace. He said she refused to provide a statement. He did not know if a deposition with Peek occurred. He denied being present at the Hickman County jail with Peek for a deposition.

On cross-examination, Agent Craig said he did not supervise Rachel Lucas while at the crime scene. He agreed that he "played a role" in deciding not to collect the sconce. He agreed that the sconce, pen, and drink containers were not collected as evidence. He did not pursue any suspects other than the Petitioner; however, there was no evidence to contradict the Petitioner's guilt.

Trial counsel testified that he had been practicing law for over forty years with an emphasis on criminal law. He represented individuals in state and federal courts, as well as at the trial and appellate levels. He had tried over three hundred cases, with twenty-five homicide cases. He had experience handling a State's expert as well as hiring a defense expert. He was retained by the Petitioner a few days after his arrest and met with the Petitioner's family. He learned through the Petitioner's brother early on in this case that the Petitioner may have had a mental health defense stemming from his military background. He reviewed some military health records; however, the Petitioner told him that it would not be a defense. He represented the Petitioner at trial, and another attorney represented him on appeal. Trial counsel hired an investigator to assist him in this case. He said the investigator did not create a written report of his findings because he did not "have to give reports that don't exist." He met with the Petitioner's family several times at their home. He met with the Petitioner at the jail while the Petitioner was in custody and at his office when the Petitioner was on bond. He agreed that he had sent the Petitioner written correspondence to update him on the case.

Trial counsel discussed the facts of the case with the Petitioner, provided him with discovery, and reviewed the material with the Petitioner. Trial counsel said the Petitioner appeared to understand what he said, did not have a language barrier, and did not claim to need hearing amplifications. Trial counsel stated that the Petitioner was very engaged in all conversations he had with him before trial. Compared to his other clients with intellectual disabilities, the Petitioner was "very astute" and "contributed greatly" to what they were trying to accomplish. Trial counsel said he discussed multiple defenses with the Petitioner. First, trial counsel discussed the defense theory that the Petitioner was not present; however, to assert this defense, trial counsel needed the Petitioner to testify at trial. Trial counsel's strategy changed "based on the statements [the Petitioner] made to [him] that put [trial counsel] in a position where [trial counsel] could not ethically call [the Petitioner] as a witness." Trial counsel explained, "It happened in Nashville when he visited me at my office and he told me that he had killed [the victim]." Trial counsel said the Petitioner "described it in great detail[,]" and recalled the Petitioner said:

> [The Petitioner] shot [the victim] in the chest and that [the victim] grunted and then [the Petitioner] shot him again. And [the Petitioner] told me, "and I shot him in the same hole that I shot him the first time." So [the Petitioner] admitted killing him, so I knew that he couldn't testify.

- 14 -

When asked if the Petitioner mentioned anything about making the victim write anything while he was there, trial counsel said,

I think he -- I think he talked about writing that note, but I think that's when I realized that he couldn't testify. I had concerns even before then as to whether or not he might be an effective witness because of -- in discussing the details, I'm -- I wasn't convinced that maybe somebody else might have been killed had they walked in.

Based on the Petitioner's statements, trial counsel said that he could not ethically call the Petitioner as a witness to testify. Trial counsel said he could not suborn perjury, pivoted to another strategy, and discussed a mental health defense with the Petitioner. Although it was not a total defense, trial counsel opined that it would have supported a lesser-included offense. Trial counsel said the Petitioner "shut [him] down completely" and refused to cooperate with a mental health defense. The Petitioner told trial counsel, "[T]hat's not a defense. There's nothing wrong with me. I wasn't there." Trial counsel said the Petitioner was deemed competent to stand trial, and any mental health evaluation would have been based on diminished capacity. Trial counsel maintained, however, that the defense remained "they couldn't prove that [the Petitioner] was there." Trial counsel further insisted that their strategy was to make the State prove their case and to argue that they had not met their burden of proof.

On the morning of the trial, trial counsel said that the Petitioner was in court. Trial counsel explained that he had asked for an in-chambers meeting with the State and the trial judge to request a continuance based on the Petitioner's request to use the diminished capacity defense. Trial counsel confirmed with the Petitioner's brother that the Petitioner wanted to assert diminished capacity. Trial counsel moved for a continuance because he believed the Petitioner had a right to assert that defense and for his lawyer to prepare for that defense. Trial counsel said he was not prepared to assert diminished capacity on the morning of trial. He explained that he did not prepare that defense because the Petitioner initially insisted they not use it. Trial counsel had obtained an "informal opinion" or an ethical opinion as to what a lawyer should do when there is a potential diminished capacity defense and the client will not let him use it. Trial counsel was advised that, "it's [the client's] call, it's his case." Had trial counsel sent the Petitioner for a mental health evaluation, trial counsel did not believe the Petitioner would have complied. Trial counsel was prepared to defend the case by requiring the State to meet its burden, cross-examining witnesses, and attacking their evidence. Trial counsel also moved to withdraw from representing the Petitioner on the morning of trial and reasoned that the Petitioner had a right to present his preferred defense. Trial counsel recalled that the trial judge excused the jury following voir dire and explained to the Petitioner what had occurred in chambers.

- 15 -

Trial counsel could not recall whether he spoke with the Petitioner following the in-chambers discussion. The State refreshed his recollection with an excerpt from the trial transcript, and trial counsel stated that he believed the Petitioner withdrew his desire to proceed with a mental health defense and wanted to proceed with the trial. Trial counsel recalled that the Petitioner's father pressed the diminished capacity defense, and not the Petitioner.

Before trial, trial counsel filed and litigated a motion to suppress. In response to the State's alibi notice, trial counsel filed a witness list with fifteen witnesses. As part of his strategy, trial counsel stated that he had subpoenaed these witnesses "in case we needed them." Trial counsel said that before trial, the Petitioner did not indicate that he had a hearing problem. The first time trial counsel was informed that the Petitioner had difficulty hearing was during the trial. When the Petitioner said he could not hear, the trial judge stopped the proceeding, addressed the Petitioner, and ensured the courtroom was set up with "amplification devices" so the Petitioner could hear.

Trial counsel explained his approach to a trial was to "always set it up for the closing argument." He would work "backwards" and determine how he could conduct voir dire and cross-examination that would produce his closing argument. He acknowledged that at times it would be necessary to "tweak" the closing. Trial counsel multitasked during the trial and provided the Petitioner with a pen and paper to write notes, allowing him to communicate with the court during the proceedings. Trial counsel stated that the Petitioner was engaged and communicated with him during trial.

Trial counsel said that he objected to the note recovered from the Petitioner's truck based on hearsay during a jury out-of-court hearing. The trial court agreed that the note was hearsay. Trial counsel requested that the note be redacted. He agreed that the State called a handwriting expert at trial. He did not employ a handwriting expert because he "saw no value in that." He did not want to create a "battle of the experts" when he knew hiring his own handwriting expert would have "validated" the State's expert. He said he made a tactical decision not to hire a handwriting expert. Trial counsel was familiar with the Daubert standard for expert testimony, and he agreed that he would not have offered an expert to testify at the Petitioner's trial to "a possibility that jurors would absorb . . . the contents of a handwritten note when that wasn't conclusively scientifically proven."

Trial counsel did not consider it necessary to interview Dr. Jackson, the Humphreys County Medical Examiner. He read the medical examiner's report, which was provided by Dr. Deering, who performed the autopsy of the victim and testified at trial. Trial counsel did not believe Dr. Jackson "could add anything" to the Petitioner's case. Wayne Ellison and John Ethridge escorted trial counsel to the crime scene location without the presence

of the district attorney. Trial counsel said he was able to ask them any questions during that time. Trial counsel agreed that he received the TBI Ballistics report in the middle of the trial. Trial counsel did not receive the TBI Firearms Ballistic report prepared by the examiner. Trial counsel did not employ a firearms expert because he "knew exactly what the answer was going to be when I asked it." Trial counsel said he did not need to hire an expert to say that the expert could not testify beyond a reasonable doubt that the pellets taken from the victim's body were fired from the gun, which is what Special Agent Brodhag testified to. He also did not need an expert to testify regarding trajectory. Trial counsel said he did not know who was shooting the gun and focused on his defense that the Petitioner was not there. Trial counsel said the trajectory did not have "any value." Trial counsel had experience comparing prior firearms and with the State's firearm experts. Trial counsel was confident he could elicit the information he needed for his defense. He did not believe he needed a "crime scene expert" because he was unsure what that meant. He went to the crime scene, reviewed it, and spoke with various individuals. He said he did not believe he needed a crime scene expert.

Trial counsel said he would not have requested testing of the items in the photographs, including the sconce, a pen, a lighter outside, and a cigarette. Trial counsel said he was concerned the results would have been inculpatory, and he did not want to know the answer. He did not lodge a Ferguson objection because he did not "see any reason" to do so.

Trial counsel conducted a Momon hearing with the Petitioner at the trial, and the Petitioner waived his right to testify. At the Momon hearing, the Petitioner was aided with hearing amplification and, according to trial counsel, was able to hear and understand the proceeding. Trial counsel stated that the Petitioner did not inform him that he could not hear. Trial counsel explained his statement that he was not going to object during the State's closing as he had never seen any success in objecting to the State's argument. However, he stated that if the closing "got way out of hand," he would object to it. In this case, trial counsel's closing was "fairly lengthy," "very detailed," and highlighted the inconsistencies in the testimony of the State witnesses.

Trial counsel recalled Jacqueline Peek and stated the trial judge ordered a deposition for her. He stated that the deposition did not occur because he was not present at it. He reasoned it would not have happened without his presence, and he was not there. Trial counsel was shown a 2011 letter he sent to the Petitioner, noting that, "The criminal deposition of Jackie is set for March 28, 2011. We will talk about that." Trial counsel was shown a second letter from March 23, 2011, that he had sent to the Petitioner. The March 2011 letter stated, in relevant part, that "We were right, her lawyer has intervened, so there will be no deposition. You and I will use this time for case prep." Based on the two letters, which were admitted as exhibits, trial counsel reaffirmed that there was no deposition of

- 17 -

Jacqueline Peek. Trial counsel said the steps he took in preparation for the trial in this case were "extensive." Trial counsel said he met with the Petitioner a sufficient number of times to prepare for the case. The only regret trial counsel had in his representation of the Petitioner was not "exploring more deeply [the] medical records from the Army." Trial counsel lamented that he should have used the Petitioner's brother, who had some influence over the Petitioner, to convince the Petitioner to utilize them.

On cross-examination, trial counsel recalled the cross-examination of John Ethridge, the district attorney's investigator, at trial. Upon being shown Exhibit 4A, trial counsel agreed that the photograph was not admitted at trial. Trial counsel agreed the photograph showed "maybe two cans and a glass." Trial counsel agreed he did not know whose DNA or fingerprints were on the items. Trial counsel agreed he did not file any motions pertaining to the items in the photographs, nor did he seek a jury instruction from the court to advise the jury that the State did not collect the evidence. Trial counsel agreed that he had asked John Ethridge questions about riding in the truck without air conditioning, and trial counsel did not have an intended purpose for the questioning. Trial counsel agreed that this was inconsistent with his prior direct testimony, in which he stated that he limited his questions to elicit an intended response. Letters trial counsel had written to the Petitioner were admitted as a collective exhibit. Trial counsel agreed the Petitioner's case had been set for trial in August 2010 and June 2011. Trial counsel did not remember the reason or who requested the first continuance. He agreed it may have been for a mental health evaluation. Trial counsel recalled that the trial judge signed an order for a mental health evaluation on August 12, 2010. Trial counsel agreed that the reason for the continuance was for a mental health evaluation; however, the Petitioner was not evaluated. He agreed it was trial counsel's responsibility to ensure the Petitioner was evaluated and that the evaluation occurred.

Trial counsel explained his familiarity with the witnesses on the witness list. He said he knew Michelle Herbison and denied purchasing land from her during the pendency of the case. Upon being shown a land document indicating that he had, trial counsel clarified that Herbison had given him the land to secure a fee for representing her in connection with a trust. Once the legal matter was resolved, trial counsel deeded the property back to Herbison. He did not tell the Petitioner about his involvement with the Herbison land transaction. He agreed he represented Frank Murrell in a criminal federal matter during the Petitioner's case. Trial counsel agreed that Murrell entered a guilty plea on the Friday before the Petitioner's trial. Trial counsel did not recall if he told the Petitioner about his representation of Murrell. Trial counsel explained Murrell did not know anything about the Petitioner's case other than he had been a gardener or a landscaper at the victim's property. Trial counsel said Murrell was of "no value" and on the witness list "just in case."

Trial counsel stated that he may have been in another court on the Friday before the Petitioner's trial, which was a regular part of his practice. Upon being shown another document, trial counsel agreed that he had told another judge he was preparing for the Petitioner's murder trial and was unable to appear in that judge's court on June 17, 2011. Trial counsel denied being in federal court with Murrell at that time and affirmed that he was with the Petitioner at the jail. Trial counsel affirmed that he had an order from the court to do the mental health evaluation in August 2010; however, he did not raise the diminished capacity defense until June 2011. Trial counsel explained that at this point, he was advised he could use the defense. When asked to clarify what happened between his on-the-record remarks explaining what occurred in chambers and the Petitioner changing his mind about proceeding with the diminished capacity, trial counsel said, "Well, that's apparently, that's what happened based on that transcript. I don't have an independent recollection of that." Trial counsel agreed that the transcript indicated the Petitioner did not want a diminished capacity defense, while trial counsel simultaneously requested a continuance or a motion to withdraw to explore the defense. Trial counsel reiterated that "at his father's request and I mean, [the Petitioner] wanted to go that route that morning but apparently changed his mind. That's my recollection."

When asked why he continued to "see an issue" after the Petitioner changed his mind, trial counsel said he was concerned about diminished capacity. Pressed further as to why he did not follow up on the order for the mental health evaluation, trial counsel explained that the Petitioner told him he could not use the defense, and "the Board" later advised him that it was the Petitioner's call. Trial counsel agreed that the Petitioner was in custody during this time and could not have obtained the evaluation on his own. Trial counsel could not recall whether he told the Petitioner privately that he was seeking a continuance before the Petitioner heard it in open court on the morning of the June 2011 trial. Trial counsel agreed that after his motion to continue was denied, he moved to withdraw, which was a spur-of-the-moment decision.

Trial counsel agreed that he did not file any pretrial motions concerning the note and that the limiting instruction was for the jurors to analyze the handwriting, not the content of the note. He agreed that Rachel Lucas had previously testified that the note was in the victim's handwriting. Trial counsel implied he knew whose handwriting was on the note because the Petitioner told him that "he made [the victim] write it and he killed him[.]" Trial counsel could not explain why he did not stipulate that it was the victim's handwriting instead of letting the jurors see the note. Trial counsel agreed that he told the court at trial that he had someone helping him with guns; however, at the post-conviction hearing, he could not recall who that person was. He agreed that the person was not an expert, had not prepared a report, was not present at trial, and had not reviewed the TBI report. He agreed that during the Petitioner's trial, he had "a lot" of other cases he needed to work on. Trial counsel did not recall if he had requested Agent Craig's notes, nor did he have a reason for

not requesting them. Trial counsel agreed that he did not know who was interviewed by investigators and was unable to impeach those witnesses. He was also unable to learn about the investigator's decision-making process.

Upon being shown trial Exhibit 94, trial counsel agreed that he entered that exhibit at trial. Trial counsel agreed that he offered evidence that the Petitioner was on drugs in the days leading up to the offense, which caused Rachel Lucas to be afraid of the Petitioner. Trial counsel did not recall telling the jury that he was friends with the district attorney and that he would not be objecting. He said he would not be surprised if the transcript reflected those words. Trial counsel maintained that despite previously telling the jury he was not going to object, he would have objected if there was something he thought he should have objected to.

During the redirect examination, trial counsel stated that the Petitioner was not cooperating with the 2010 order for a mental health evaluation. He agreed that one reason the evaluation did not occur was that the Petitioner did not want it to happen. He clarified that he did not move in limine to exclude the note because the State had already filed a motion in limine for the same. He had no reason to believe that Agent Craig's notes differed from his reports. He may have offered negative evidence about the Petitioner "in light of more favorable evidence that was also being admitted at the time." Upon recross-examination, trial counsel did not know what evidence would have been more favorable. He was not "as concerned" with the report at trial as post-conviction counsel was at the hearing and disagreed with post-conviction counsel's characterization of the report. Upon questioning by the post-conviction court regarding the report, including both favorable and unfavorable evidence about the Petitioner, trial counsel acknowledged that he had reviewed the report before admitting it at trial and believed it benefited the Petitioner more than it harmed him.

The post-conviction court denied the petition by written order on October 24, 2023, and the Petitioner timely appealed. This case is now properly before this court for review.

## ANALYSIS

I. The Petitioner argues that he received ineffective assistance of counsel based on the following nine grounds: (1) trial counsel's failure to lodge a pretrial objection to the note found in the Petitioner's truck and the post-conviction court's exclusion of juror testimony under Rule 606(b); (2) trial counsel's failure to object during the State's closing argument; (3) trial counsel's failure to prepare for trial; (4) trial counsel's failure to investigate, call, or cross-examine key witnesses; (5) trial counsel's failure to request a Ferguson instruction; (6) trial counsel's failure to present a shooting incident reconstruction and a firearms expert; (7) trial counsel's failure to ensure the Petitioner could hear during

trial; (8) trial counsel's failure to secure the presence of the Petitioner and Jacqueline Peek for the court ordered deposition; and (9) trial counsel providing the jury with a report that contained inflammatory information about the Petitioner.[4] We will address each issue in turn.

Upon review of post-conviction claims, this court applies the following well-established legal framework. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents mixed questions of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). A post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, we generally defer to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Mobley, 397 S.W.3d at 80 (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)). However, we review a post-conviction court's application of the law to its factual findings de novo without a presumption of correctness. Id. (citing Grindstaff, 297 S.W.3d at 216; Finch v. State, 226 S.W.3d 307, 315 (Tenn. 2007); Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006)).

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) this deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an

---

[4] The Petitioner has also raised as an issue that the post-conviction court erred in giving "undue weight to trial counsel's inconsistent testimony." We will address this issue as it becomes pertinent to each of the grounds for relief.

objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

In assessing an attorney's performance, we "must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462 (citing Strickland, 466 U.S. at 689). In addition, we must avoid the "distorting effects of hindsight" and must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 689-90. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Id. at 688-89. "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369). Nevertheless, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" Id. at 515 (quoting Goad, 938 S.W.2d at 369).

1. The Petitioner contends he received ineffective assistance of counsel based on trial counsel's failure to object pretrial to the note found in the Petitioner's truck. The Petitioner concedes that trial counsel objected to the note on hearsay grounds before it was admitted as evidence during the trial. The Petitioner further acknowledges that the trial court agreed that the note was hearsay. However, upon further argument by the State, the trial court admitted the note with a limiting instruction for the jury to consider the handwriting on the note as belonging to the victim and to consider where the note came from, not the note's content. The Petitioner insists that trial counsel was ineffective in failing to continue to object to the note and the limiting instruction. The Petitioner relies on Guideline 5.1(a) of the National Legal Aid and Defender Association, Performance Guidelines for Criminal Defense Representation (1995) (NLADA), and asserts that trial counsel's "failure to file a pretrial motion to exclude or limit the note left [the Petitioner] exposed to its harmful effects" and fell below the standard of reasonable professional conduct. See NLADA Guideline 5.1(a) (providing that counsel should file motions when

there is a good faith belief the law may entitle the defendant to relief).[5]  Had trial counsel filed a motion in limine to exclude the note before trial, the Petitioner submits trial counsel could have presented expert testimony "as to the difficulty jurors would have had reading the note for its handwriting but not its contents."  Based on the testimony of Dr. Linde Christine Rush-Burkey, the forensic handwriting expert, the Petitioner further asserts that the limiting instruction was not effective in preventing the jury from improperly considering the information.  In response, the State argues the trial court twice instructed the jury not to consider the note for its content, and juries are presumed to follow the court's instructions.[6]  Accordingly, the Petitioner has failed to meet his burden under Strickland.

As an initial matter, the order of the post-conviction court combined this issue with trial counsel's failure to hire a handwriting expert.  The court determined that trial counsel was a credible witness and credited counsel's statement that hiring an expert would have been more detrimental to their defense.  We acknowledge that the findings of the post-conviction court conflated whether trial counsel should have hired an expert to determine to whom the handwriting on the note belonged with whether trial counsel should have hired an expert to testify at a pre-trial hearing that jurors could not disregard the content of the note.  Nevertheless, upon our review, we conclude that the Petitioner has failed to meet his burden of proof.  Indeed, as conceded by the Petitioner, the record shows the State filed a motion in limine regarding the note, and there is no proof establishing that the trial court would have conducted a hearing on this issue before trial.  Additionally, trial counsel objected to the note as hearsay, and the trial court agreed.  The trial court admitted the note after the State offered to "take out the content" or redact the note.[7]  The State advised the court that the content of the note "was not at issue," and they were offering the note only

_____

[5] The NLADA is a private, non-profit, national membership organization dedicated to assuring the availability of high-quality legal services for poor people, advocates for quality defense representation, and promulgates general standards related to the provision of counsel.  Nat'l Legal Aid & Defender Ass'n., *Performance Guidelines for Criminal Defense Representation (Black Letter)*, NLADA (last visited June 9, 2025), https://www.nlada.org/defender-standards/performance-guidelines/black-letter.  Notably, Guideline 5.1(c) provides, in relevant part, that counsel should withdraw or decide not to file a motion only after careful consideration, and only after determining whether the filing of a motion may be necessary to protect the defendant's rights against later claims of waiver or procedural default.  Id.

[6] The State also points out that before trial, trial counsel moved to suppress the contents of the Petitioner's truck, which included the note.  We disagree with the State's characterization of the motion to suppress.  Our review of the record from the motion to suppress hearing shows that Agent Craig testified that there were two sets of "notes" involved in this case.  A set of notes taken from the body of the Petitioner at the time he was processed in jail, and the instant set of notes recovered from the Petitioner's truck.  Although trial counsel asked Agent Craig whether the "notes" in the affidavit for the search warrant for the Petitioner's truck were the notes Agent Craig sent for analysis to determine who wrote them, Agent Craig clarified that the notes referred to in the affidavit were taken from the body of the Petitioner.  In other words, at the time Agent Craig obtained the search warrant, he was unaware there were any notes in the truck.  As such, we will disregard this aspect of the State's response.

[7] The record does not reflect that the note was redacted.

to show that the Petitioner had been inside the victim's home. Trial counsel agreed that the content was hearsay, and if the State "took everything out but 'Saul Beard'", then "that's fine." The court admitted the note, reasoning that the content of the note was hearsay but that the jury could consider the note "for the fact that the writing on the note is that of [the victim], as testified to." The court also noted that trial counsel "brought out that Saul Beard's probably got a lot of paper around with his name on it. The fact it's got [the victim's] name on it adds weight to the fact that the note came from the [victim's] household."

After the court's ruling limiting the admissibility of the note, the prosecutor said, "because of the court's ruling, the blown up one which was marked for identification purposes, 102, -- I think given the court's ruling that that shouldn't -- I'm not moving that as an exhibit." Accordingly, contrary to the assertions in the Petitioner's brief, Exhibit 73 was the only note admitted as an exhibit at trial. Exhibit 102, an enlargement of the note was admitted for identification only and never published to the jury. Exhibit 73, as shown below, is a handwritten note signed presumably by the victim with the following message on one side of the note, "Dear Jackie, I apologize for telling Stuart the 1st time I brought you to my house that I would have you." On the other side of the note, the names "Saul L. Beard" and "Phillip McCay" appear with another handwritten message.



Before permitting the witness to testify regarding the note, the court provided the jury with the following limiting instruction:

> THE COURT: You're fixing to see some evidence in this case that's been previously marked for identification and you're going to see it here in a minute. It's going to be a piece of paper with some writing on it. You're

not to consider the writing that is on this note for its content. There's going to be some testimony that the writing is [the victim's]. You're only to consider the testimony and what is on this note for the fact that the writing on the note is the handwriting of [the victim]. Can everybody do that? You understand what I'm saying? You can't consider what it says, just the fact that it's [the victim's] writing.

The next morning, before allowing the jury to examine the note, the trial court instructed the jury a second time:

> THE COURT: Ladies and gentlemen, I'm going to pass the note that was introduced yesterday to you and let you look at it. Again, remember what the note says is not important, it's the fact if you believe where it came from and if you believe that the writing on it is [the victim's] writing. The way I stated it yesterday made it sound like it was but you heard testimony the decision as to whether or not the writing on the note is the writing of [the victim] is a decision you'll have to make on your own. [Everyone] understand that?

The transcript reflects all jurors answered in the affirmative.

The Petitioner claims that trial counsel should have continued to object to the note and the limiting instruction based on the jurors' inability to disregard its content. He also asserts a better strategy would have been to stipulate that the note had the victim's handwriting on it. We disagree. First, while, in hindsight, a stipulation may have been a better approach, there is no proof the State would have agreed to it. Next, the Petitioner relies in part on the NLADA guidelines in support of this issue. Although some states have incorporated the NLADA guidelines into their ethical and indigent defense representation rules, Tennessee has yet to do so. Even if they applied, Guideline 5.1(a) suggests filing a pretrial motion when there is a good faith belief the law may entitle the defendant to relief, and for reasons more fully discussed below, there was no legal basis for counsel to file a motion on grounds that the jury could not follow the court's limiting instruction.

The Petitioner has likewise failed to demonstrate prejudice stemming from trial counsel's failure to file a pretrial motion to exclude the note, his failure to maintain his objection to the note at trial, or his failure to object to the court's limiting instruction for consideration of the handwriting alone. While the content of the note very well may have been prejudicial as the Petitioner insists, the purpose of a limiting instruction is to mitigate the prejudicial effect of evidence and direct the jury how the evidence should be considered. See Tenn. R. Evid. 105 (2019) ("the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"); State v. Jarman, 604

- 25 -

S.W.3d 24, 47-48 (Tenn. 2020) (noting that a defendant is entitled to a limiting instruction, "restricting the evidence to its proper scope," upon request)); State v. Jordan, 325 S.W.3d 1, 55 n.12 (Tenn. 2010); State v. Churchman, No. W2013-00175-CCA-R3-CD, 2014 WL 12651043, at *11 (Tenn. Crim. App. Apr. 28, 2014) (the jury was presumed to follow the trial court's instructions regarding prejudicial evidence offered not for the truth of the matter asserted but for its effect on law enforcement's investigation). The Petitioner does not argue that the limiting instruction given in this case was improper. Nor does he challenge the basis upon which the trial court admitted the note, i.e., to show the origin of the note and that the Petitioner was inside the victim's home.

Instead, the Petitioner relies on the testimony of an expert forensic document examiner, who noted the difficulty a jury would have had in following the court's limiting instruction and that jurors would have either intentionally or unintentionally absorbed the content of the note. However, the expert did not examine the note at issue. She also agreed that "research on the ability for juries to disregard certain information or evidence is somewhat mixed," and there was no conclusive scientific proof that jurors would disregard the information. She agreed that her opinion on this issue was not widely accepted by the scientific community, that there was no research supporting her theory, and that it had not been scientifically proven. Under these circumstances, her testimony is unreliable and unpersuasive.

The Petitioner is, in effect, arguing that trial counsel should have anticipated that a jury would be incapable of following the court's limiting instructions. This, however, is contrary to well-established law. Parker v. Randolph, 442 U.S. 62, 73 (1979) abrogated on other grounds, Cruz v. New York, 481 U.S. 186 (1987) ("A crucial assumption underlying [the criminal trial] system is that juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed."); State v. Schubert, No. E2019-01257-CCA-R3-CD, 2021 WL 867121, at *7 (Tenn. Crim. App. Mar. 9, 2021) (rejecting defendant's challenge to admission of hearsay based on jury's inability to remove the truth of the matter asserted from its consideration because a jury is generally presumed to follow a trial court's instructions). While there are situations where a limiting instruction cannot cure the prejudicial effect of evidence, see e.g., Bruton v. United States, 391 U.S. 123, 135-37 (1968) (limiting instruction inadequate where one defendant's confession implicates another), Shepard v. United States, 290 U.S. 96, 104 (1933) (limiting instruction inadequate where murder victim's statement that defendant poisoned me was admitted for nonhearsay purpose), the Petitioner has failed to establish that any of those situations apply here. Under these circumstances, any objection on this ground would have been futile. Accordingly, it was reasonable for trial counsel to believe that a jury instruction given by

the court, advising the jury to disregard the content of the note, would cure any risk posed by the writing on it.

In a related issue, the Petitioner argues the post-conviction court erred in precluding a juror from his trial from testifying at the post-conviction hearing that she purportedly considered the inadmissible contents of the note. We disagree. Rule 606(b) of the Tennessee Rules of Evidence bars juror testimony and affidavits concerning jury deliberations but permits testimony and affidavits pertaining to extraneous prejudicial information, outside influence, and agreed quotient verdicts. Tenn. R. Evid. 606(b). Additionally, Rule 606(b) bars testimony as to "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind." Id. The Petitioner argues that the trial juror's testimony would have revealed whether the jury was exposed to external factors and compromised the integrity of the verdict. He submits that the juror's testimony meets the extraneous prejudice exception.

Extraneous prejudicial information has been broadly defined as information "coming from without" or "in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." State v. Adams, 405 S.W.3d 641, 650 (Tenn. 2013) (internal citations omitted). An improper outside influence is any unauthorized "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." Id. at 650-51. As previously discussed, the trial court admitted the note for the limited purpose of establishing its origin/that the victim's handwriting was on it, not for its content. The jury is presumed to follow the court's instructions. The note and the trial court's instruction were provided to the jury in open court and do not qualify as extraneous. Because a jury's interpretation and application of the court's instructions fall squarely within its deliberative process, we conclude that the post-conviction court properly excluded the juror's testimony under Rule 606(b). Walsh v. State, 166 S.W.3d 641, 647 (Tenn. 2005)( "[A] juror is not permitted to testify about anything occurring during deliberations, including the juror's own internal thoughts, motivations, or emotions."); see also United States v. Rutherford, 371 F.3d 634, 640 (9th Cir. 2004) (concluding that Rule 606(b) bars consideration of jurors' statements that they ignored the court's instructions and discussed a defendant's failure to testify during deliberations); United States v. Tines, 70 F.3d 891, 898 (6th Cir. 1995) (citing Peveto v. Sears, Roebuck & Co., 807 F.2d 486, 488 (5th Cir. 1987) and Woods v. Bank of New York, 806 F.2d 368, 373 (2d Cir.1986)). The Petitioner is not entitled to relief.

2. The Petitioner contends that he received ineffective assistance of counsel based on trial counsel's failure to object during the State's closing argument. Specifically, the Petitioner claims that trial counsel failed to object to various instances of prosecutorial misconduct, including references to the inadmissible content of the note, emotional appeals to the jury based on repeated references to Thanksgiving, improper witness vouching, and

- 27 -

the State's rebuttal closing exceeding the scope of its first closing. In support of how trial counsel's actions prejudiced his defense, the Petitioner asserts that trial counsel abandoned the Petitioner and relinquished his role as trial counsel based on trial counsel's statements during closing argument that he would not object during the State's rebuttal closing, that he was friends with the prosecutors, and that the State's first closing argument was "wonderful." The Petitioner insists that trial counsel improperly bolstered the State's credibility. In response, the State contends that trial counsel's decision not to object was an informed choice based on adequate preparation, Goad, 938 S.W.2d at 370, and that, in light of the evidence of the Petitioner's guilt, no prejudice resulted from trial counsel's failure to object.

Closing arguments function "to sharpen and to clarify the issues that must be resolved in a criminal case." State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008) (citing Herring v. New York, 422 U.S. 853, 862 (1975)). They also enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." Id. (citing Christian v. State, 555 S.W.2d 863, 866 (Tenn. 1977)). Because counsel in criminal cases "are expected to be zealous advocates," they should be afforded "great latitude in both the style and the substance of their arguments." Id. at 130-31.

However, prosecutors, "while permitted to advocate for the interests of the State 'with thoroughness and vigor,' . . . must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" State v. Hawkins, 519 S.W.3d 1, 47-48 (Tenn. 2017) (quoting Banks, 271 S.W.3d at 131). "[P]rosecutors 'may strike hard blows, . . . [but they are] not at liberty to strike foul ones.'" Banks, 271 S.W.3d at 131 (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). "'[I]mproper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.'" State v. Sexton, 368 S.W.3d 371, 419 (Tenn. 2012) (quoting Berger, 295 U.S. at 88). Consequently, "a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." Banks, 271 S.W.3d at 131 (citing State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999); Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976)). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices[.]" Id. (citations omitted).

This court has recognized five general categories of prosecutorial misconduct:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

- 28 -

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. See Cauthern, 967 S.W.2d at 737; State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. See Cauthern, 967 S.W.2d at 737; State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citing Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

The following five factors should be considered when determining whether the prosecutor's improper argument could have affected the verdict to the prejudice of the defendant:

(1) The conduct complained of viewed in context and in light of the facts and circumstances of the case.
(2) The curative measures undertaken by the court and the prosecution.
(3) The intent of the prosecutor in making the improper statement.
(4) The cumulative effect of the improper conduct and any other errors in the record.
(5) The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see Sexton, 368 S.W.3d at 426; State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

This court has recognized that decisions of a trial attorney as to whether to object to the arguments of opposing counsel "are often primarily tactical decisions." Payne v. State, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010), perm. app. denied (Tenn. May 11, 2010)). This means that even experienced advocates may differ about when or whether an objection is called for as a matter of trial strategy. Trial counsel could refrain from objecting for several valid tactical reasons, including not wanting to emphasize unfavorable evidence. Payne, 2010 WL 161493, at *15. As a result, "testimony from trial counsel as to why he or she did not object to the allegedly prejudicial remarks is essential to determine whether trial counsel was ineffective." Brooks v. State, No. M2010-02451-CCA-R3PC, 2012 WL 112554, at *14 (Tenn. Crim. App. Jan. 11, 2012). Absent testimony from trial counsel or any other evidence indicating that counsel's decision was not tactical, "we cannot determine that trial counsel provided anything other than effective assistance of counsel." Id.

A. Improper Comment on Note. The Petitioner asserts in his brief that trial counsel was deficient in failing to object when the State, in its rebuttal closing, told jurors, "If you didn't know that the [Petitioner] kept this as a souvenir for the murder he committed, it wouldn't mean anything. It would just be a piece of paper." The Petitioner argues that counsel should have objected because "it is the contents of the note that make it more than a piece of paper[,]" and the content was inadmissible. The Petitioner relies on the testimony and report of Dawson, who opined that the State utilized the note beyond the limited purpose for which it was admitted based on the following excerpt from the State's rebuttal closing:

> Now let me talk about what is one way that you can—if you want to tear a set of facts apart in a case like this, what you do is you compartmentalize those facts. [Trial counsel] doesn't want you to look at the facts taken together. He wants to compartmentalize one little fact over here and say that setting alone doesn't mean that much. It's when you look at the entire picture of things, and that's what you do as a jury, as a group and as an individual, you look at the facts and you put those facts together.
>
> If you didn't know about this note that was found in the [Petitioner's] truck that Rachel has testified has [the victim's] signature in two places, and she recognized the writing as being [the victim's], well, that ink pen on the floor wouldn't mean anything. If you didn't know that the [Petitioner] kept this as a souvenir for the murder he committed, it wouldn't mean anything. It would just be a piece of paper. Why, Rachel could've thrown that down in the yard out there and he just picked it up out there while he was out there smoking that joint of marijuana. That's not what your common –

The Judge is going to tell you to use your common sense when you put these facts together . . . .

Dawson opined that "[w]hat allows the jury to use common sense for a finding of guilt is the content of the note." We disagree. First, the record shows that upon being asked generally why he did not object to the State's closing, trial counsel said that he never had a lot of success in objecting to closing unless it "got way out of hand" and that he did not believe that happened in this case. Post-conviction counsel did not follow up to ask trial counsel specifically why he did not object to the above excerpt and rested on trial counsel's general response. The post-conviction court found that trial counsel was a credible witness and credited trial counsel's testimony. Because trial counsel was not asked about the above excerpt at the post-conviction hearing, the record does not preponderate against the court's determination. Even if trial counsel had been questioned, we do not interpret this excerpt from the State's rebuttal as urging the jury to consider the content of the note. In our view, the comment can be equally interpreted as focusing the jury's attention on reasonable inferences from the evidence, including the fact that a pen was found on the floor of the victim's home, the victim's handwriting/signature on the note found in the Petitioner's truck, and the fact that the note was in the possession of the Petitioner shortly after the victim was killed. Because this excerpt from the State's rebuttal does not amount to prosecutorial misconduct, the Petitioner has not established that an objection by trial counsel would have been successful. Accordingly, he is not entitled to relief.

B. Improper Emotional Appeals to the Jury. The Petitioner argues that the State "manipulated the jury's feelings by appealing to their emotions to divert their attention from the weak evidence." He relies, in large part, on Dawson's report and testimony from the evidentiary hearing, criticizing the State's repeated references to Thanksgiving to evoke sympathy. In his report, Dawson opined that trial counsel should have objected to the following comments from the State's closing and rebuttal closing arguments:

Suddenly, Rachel was awakened, it's Thanksgiving morning, did she wake up to smell the turkey, to her breakfast coffee? No, no she doesn't wake up to that. She woke up to two loud bangs: bang, bang (demonstrating). Startled, scared, she looked at the clock on her bedside table, 9:00 a.m.

Dawson asserted the above reference to Thanksgiving was improper because "[w]hile the jurors very well might have been waking up to the smell of turkey, Rachel Lucas had no reason for any such expectation. She had testified that she had made homemade vegetable soup for Thanksgiving." Regarding this reference, Dawson opined there was nothing in the record to support a fair inference from the evidence. He pointed to several other references including, after the State described how the victim was found,

"that is what Rachel Lucas was greeted by on Thanksgiving morning 2009", after discussing Scott Dodd's testimony, "[w]ell, folks, when you see that on Thanksgiving morning across the street from you, you know something's up. He further relies on the following excerpt from the State's closing:

> Ladies and gentlemen, I propose to you that what you have seen and heard is evidence sufficient for you to find the [Petitioner] guilty of everything he's charged with because in a perfect world Thanksgiving morning shouldn't be like this. Quoting Dr. Deering, wound "B" obliterates the top of the heart, the chambers of the heart are all opened due to the shotgun wound, the epicardium has been lacerated, a fragment of plastic shot cup was dug out of his liver. [The victim] would've been dead in a matter of seconds. But mostly, Thanksgiving morning should not end like this.

Dawson opined that the above excerpt was improper because "it says nothing that points to the [Petitioner] as the person who killed [the victim]" and "tells the jury the evidence to convict is sufficient because it's Thanksgiving morning." Finally, Dawson opined that the following excerpt from the State's rebuttal closing was improper:

> There's a lot of victims in this case. Rachel Lucas is a victim. Her family is a victim. Her now 98-year-old mother, [the victim's] mother-in-law, was a victim when she didn't get to break bread with them that day on Thanksgiving Day.

> The sirens on Thanksgiving Day, that's not what we want to hear in our neighborhood on Thanksgiving. We want to be cooking those turkeys and being with our families . . . .

The record shows that trial counsel was not explicitly asked why he did not object to the State's repeated references to Thanksgiving, and the post-conviction court did not determine this issue. Nevertheless, based on the issue presented in his petition and Dawson's testimony and report, we conclude this issue is properly preserved. We have reviewed the entirety of the State's closing and rebuttal argument and conclude that their collective references to Thanksgiving were improper. The first two references to Thanksgiving allude to the State's opening theme that we do not live "in a perfect world" when the victim was shot twice sitting on his own sofa in his own home on Thanksgiving morning with a 12-gauge shotgun which "obliterated" his heart and a wife awakening on Thanksgiving morning to two loud noises: Bang, Bang (demonstrating) and running down her hallway screaming the victim's name. At a minimum, the allusion to Thanksgiving, combined with how the victim's body was found, constitutes an emotional appeal to the jury. The State referenced the holiday again in describing the reason why Scott Dodd's

observation of police in the victim's driveway was unusual, which, in isolation, was proper. However, the fifth and sixth references to "Thanksgiving morning shouldn't be like this" at the end of the closing were also improper. In the rebuttal close, the seventh reference to the victim's family being unable to "break bread" with the victim on Thanksgiving because of the Petitioner, and the eighth reference, not wanting to hear "sirens" in our community on Thanksgiving, were wholly improper.

While a passing reference to a holiday as the date of the offense is certainly not grounds for a claim of improper argument, we are inclined to agree with the Petitioner that the repeated references to Thanksgiving in this case were improper appeals to the jurors' emotions. See e.g., Quillen v. State, 929 P.2d 893, 901 (1996) (noting that so-called "holiday" arguments are inappropriate but rarely warrant reversal by themselves) (citations and footnote omitted). Trial counsel's failure to object to the State's repeated reference to Thanksgiving fell "below an objective standard of reasonableness under prevailing professional norms."

However, we agree with the State, and conclude based on the overwhelming evidence of the Petitioner's guilt, that he failed to establish that trial counsel's failure to object would have changed the outcome of his case. At trial, the State's proof identifying the Petitioner as the perpetrator of the offense included an officer's testimony that Rachel Lucas unequivocally identified the Petitioner as the perpetrator at the crime scene; several witnesses who observed the Petitioner at the Lucases' home before and after the offense; "[n]umerous witness" observed the Petitioner "with a 12-gauge shotgun" "immediately" before and after the offense; the marijuana cigarette at the crime scene with the Petitioner's DNA, and testimony about the marijuana odor from his truck; Rachel Lucas' testimony that the victim had a lot of cash in his wallet before the offense, but that his wallet was empty after the offense; witnesses who testified that the Petitioner had no money before the offense, but officers found nearly $800 in his possession upon his arrest; "expert testimony that the shotgun shells recovered from the Petitioner's brother were fired from the Petitioner's shotgun and that the load of those shells was consistent with the materials found in the victim's body"; and the Petitioner's motive to kill the victim, who "had been the long-time boyfriend of the victim's fiancée." Based on this evidence, the Petitioner has failed to establish "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" He is not entitled to relief.

C. Improper Vouching. The Petitioner argues trial counsel failed to object to several statements by the State that conveyed personal beliefs in the truthfulness of Rachel Lucas's testimony; namely, that the defense "attacked Mrs. Lucas" and asserted that the 911 call "reek[ed] of believability[,]" implying "that if Lucas were fabricating her story, she would have claimed to see the [Petitioner] commit the crime on the 911 call." The State further argued that "Lucas's account was credible because she focused on her

husband during the incident and did [not] claim to see the shotgun in the [Petitioner's] hand, suggesting she was [not] embellishing her story." The Petitioner asserts the State concluded by defending Lucas's truthfulness, stating that "the defense's claim she lied was inconsistent with the evidence shown in photographs."

The Petitioner relies on Dawson's testimony that the State "improperly bolstered Rachel Lucas's credibility by suggesting that her testimony was inherently truthful because she did not embellish her account" and improperly influenced the jury's assessment of witness credibility. The Petitioner also points to the State's reference in closing that "there was a silver Toyota Tacoma in [the victim's] driveway. Very specific, knew exactly what it was because [Scott Dodd] used to have one just like it." The Petitioner relies on Dawson's testimony that this was improper witness vouching because "[n]either Scott Dodd nor his wife mentioned that he had owned a truck like that . . . so that simply was something not in evidence, but it was used to sort of advance the credibility of that witness." According to the Petitioner, this is significant because Scott Dodd "was a crucial witness for the State's presentation of a timeline."

The Tennessee Supreme Court held that it is unprofessional conduct for a prosecutor during closing argument "to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence" and that "any intentional effort to influence the members of a jury by expressions of personal opinion cannot be condoned." State v. Henley, 774 S.W.2d 908, 911 (Tenn. 1989); see Tenn. Sup. Ct. R. 8, § 3.4(e)(3) ("A lawyer shall not . . . in trial . . . state a personal opinion as to the justness of a cause, the credibility of a witness, . . . or the guilt or innocence of an accused[.]"); State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999) ("[A] lawyer should not assert his or her personal opinion as to the credibility of a witness, or as to the accused's guilt or innocence."); ABA Criminal Justice Standards for the Prosecution Function, Standard 3-6.8(b) ("The prosecutor should not argue in terms of counsel's personal opinion, and should not imply special or secret knowledge of the truth or of witness credibility.").

Once again, trial counsel was not asked at the evidentiary hearing why he did not object to the portions of the State's closing that the Petitioner now asserts on appeal were improper, and the post-conviction court did not address this issue in its order. Because this issue was thoroughly raised in his petition and addressed at the evidentiary hearing, we consider it properly preserved. We have reviewed each of the references identified by the Petitioner in this section of his brief as improper and disagree that they constitute prosecutorial misconduct. Regarding the allegations of improper vouching for Rachel Lucas in the State's rebuttal closing, we do not view the prosecutor's remarks as injecting his personal opinion or belief about the credibility of Rachel Lucas. At trial, in response to trial counsel's cross-examination, Rachel Lucas herself said, "I didn't see [the Petitioner] shoot [the victim] and he didn't look at me. If I were lying, I'd say he looked at me. If I

were lying, I would say I saw him look at me but he didn't." The prosecutor's remarks were rooted in the evidence and in response to trial counsel's defense closing statement challenging the credibility of Lucas's testimony, which the State was entitled to rebut. See Sexton, 368 S.W.3d at 419-20 (proper to point to "specific evidence which tended to" reflect on a witness's credibility); State v. Hill, No. E2015-00811-CCA-R3-CD, 2017 WL 532481, at *35 (Tenn. Crim. App. Feb. 9, 2017) (holding that despite the theme of the prosecutor's argument that certain witnesses were believable, the argument was limited to explaining why the jury should accredit the testimony of those witnesses and was focused on explaining why those witnesses testified truthfully). At the post-conviction hearing, Dawson agreed that the State's comment about a silver truck and the Dodds' may have been an oversight, rather than intentional. Dawson considered it "excusable," but still "improper." While the record shows that the prosecutor misstated the evidence, it does not show that it was done intentionally to mislead the jury, and it was not repeated or emphasized in any significant way. We do not view trial counsel's failure to object to this misstatement as deficient, and the Petitioner cannot establish prejudice to his defense. The record shows that several witnesses, other than Scott Dodd, identified a truck similar to the Petitioner's in the victim's driveway on the morning of the offense. Pam Gunn, a friend and confidante of the Petitioner, testified that on the morning of the offense, she had gone to the store, and when she returned "a little after 8:00 o'clock," the Petitioner's truck was in the front of the Lucas home. She also identified the Petitioner as "sitting in the truck towards the west." Given the other evidence concerning the presence of the Petitioner and his truck in the victim's driveway, the Petitioner has failed to establish prejudice based on trial counsel's failure to object to the prosecutor's misstatement of the evidence. He is not entitled to relief.

D. Failure to Object to State's Rebuttal as Beyond the Scope of First Closing. In his brief, the Petitioner argues that trial counsel was deficient in failing to object to the rebuttal closing as beyond the scope because the State introduced a new theory by referencing the note found in the Petitioner's truck, which was not presented during the State's closing argument. The record shows that trial counsel was not asked about this ground for relief, nor was it addressed in the order. Nevertheless, because it was raised in the petition and addressed in Dawson's report, we conclude it is properly preserved. The record shows that toward the end of his closing argument, trial counsel said that the State was "going to make a big deal out of the fact that there was a piece of paper that came from the home of [the victim] that was recovered from the truck of [the Petitioner]." Trial counsel then urged the jury "that alone" did not mean the Petitioner killed the victim. He continued to address the inconsistent testimony provided by Rachel Lucas regarding where she cut up the notes and the lack of evidence showing when the note in question was taken from the office. Based on these statements, any objection to the State's rebuttal closing would have been unsuccessful because the prosecutor's comments were in direct response to trial counsel's closing argument. See Tenn. R. Crim. P. 29.1 (c)(2) (providing that the scope of the state's

rebuttal closing argument is limited to the subject matter covered in the state's first closing argument *and* the defendant's intervening argument). Because the Petitioner cannot establish that such an objection would have been successful, he is not entitled to relief.

E. Trial Counsel's Statements.  Finally, the Petitioner argues that trial counsel's statement during closing argument that he would not be objecting to the State's rebuttal "left him in a position to either allow the prosecution unconditional latitude or object and break his promise to the jury."  In his brief, the Petitioner asserts that trial counsel's comments that he would not object to the State's rebuttal due to his friendship and trust in the prosecutor were "a clear violation of ABA standards on criminal defense closing arguments, considering it an abandonment of the client's interests."  The Petitioner also takes issue with statements trial counsel made to the jury, including that the State's closing was "wonderful", closing arguments were a waste of time, that he believed jurors preferred not to hear them, and that he had no recourse to respond to what the State presented.  Based on Dawson's testimony, the Petitioner claims these statements violated practice standards and incorrectly conveyed to the jury that trial counsel had no power to counter the State's arguments in contrast to Tennessee Rule 29.

The post-conviction court found that trial counsel was a credible witness regarding this issue.  At the post-conviction hearing, upon being asked why he told the jury he was not going to object to the State's closing argument, trial counsel explained, "I've never seen success in objecting to the State's argument.  I just always reaffirm to the jury that the Court is instructing you that what lawyers say is not evidence and that I'm asking you to focus on the evidence.  And if [closing argument] got way out of hand, I would object to it, but I don't recall that . . . I don't object just to show that I know how to object."  He agreed that his decision to object or not was part of his trial strategy.  Asked on cross-examination if he remembered telling the jury in closing argument "that you were friends with the d[istrict] a[ttorney] and that you won't be objecting" during the closing, trial counsel said he did not recall.  The record does not preponderate against the court's determination.  The relevant portion of trial counsel's closing argument is as follows:

> Closing argument, which is what we're doing now, because the State has the burden of proof, they get to go last.  [The prosecutor] made a wonderful statement.  I'll get to speak and then they'll get the last word, and it's because the State has the burden of proof.  So I know you'll pay attention like you have been because as much as I might want to get back up after they finish, I can't, and I'm sure you're glad of that because if you allowed lawyers to jump back and forth it would go on forever.

> Closing argument, I've been -- like I told you in voir dire, I've been practicing law 30 years, and we lawyers sometimes give ourselves a sense of

self-importance that's really not warranted and I've learned in 30 years to question just how effective is a closing argument. I've had cases where I've spoken to jurors afterwards and they said I wish the judge would have just charged us, given us our instructions after the proof. Cases aren't won or lost on closing argument. The purpose of it is to kind of give you an overview of our position and we've – we're going to have different positions, I think you know that.

. . . .

Now you've heard a lot of witnesses for five days and part of a – well, about five days but we picked you the first day. It's a lot of evidence to keep up with and we lawyers make notes of what we believe the witnesses said but you're the ones that decide. So what [the prosecutor] just told you is not evidence and what I'm telling you is not evidence. If I make a statement about some evidence that you didn't hear, disregard it. If the prosecutor tells you about certain evidence that you didn't hear, disregard it.

In some of the places I try cases, in Nashville, for example, I may be trying a case against a prosecutor that I'm not friends with, and I think – you all have been observant, you know that I know these people. In Nashville the lawyers would jump up, he's arguing something that's not in evidence. If I think they do that, I'm not going to do that, and I don't think they'll do it to me because we all know that you'll decide what the evidence was.

The above excerpt is from the beginning of trial counsel's closing argument. For the remainder of his argument, the next thirty pages of the transcript, trial counsel meticulously addresses the weaknesses in the State's case. In context, we disagree with the Petitioner's characterization of trial counsel's statements. Trial counsel did not say that he did not intend to object *because* he was friends with the State, as implied by the Petitioner. Rather, he informed the jury that both sides "knew" each other and would not object, as both sides knew the jury would decide the evidence. A fair interpretation of trial counsel's comment is that the parties practiced law together and were familiar with how each side handled objections during closing argument. While not the best practice, by making such statements, trial counsel did not abdicate his role as defense counsel or abandon the Petitioner at trial. Finally, we do not view trial counsel's description of the State's closing as "wonderful" as improperly bolstering the State's credibility. It was an isolated compliment made in the context of explaining the procedure for closing arguments. We see nothing improper with this act of professional courtesy. See, e.g., Victorino v. State, 127 So.3d 478, 495-96 (Fla. 2013) (rejecting ineffective assistance of counsel claim based on trial counsel's compliment of State's closing argument and concluding that

counsel did not concede defendant's guilt or fail to advocate on his behalf). Nor do we interpret trial counsel's statement that he would not be permitted to address the jury after the State's rebuttal as violating the principles of Rule 29. See Tenn. R. Crim. P. 29.1(d)(2) (noting that if more than two arguments are made for the state, the court shall ensure that no defendant is deprived of the opportunity to answer a new argument made by the state against that defendant); Wallis v. State, 546 S.W.2d 244, 248 (Tenn. Crim. App. 1976) (only in exceptional circumstances will the defendant have the right to rebut the state's rebuttal closing argument). Because trial counsel's strategy was reasonable, the Petitioner has failed to establish deficient performance or prejudice to his defense. He is not entitled to relief.

3. The Petitioner contends he received ineffective assistance of counsel based on trial counsel's failure to prepare for trial. He asserts nine separate arguments in support of this claim, including trial counsel's prioritizing another client, Frank Murrell, over the Petitioner on June 17, 2011, when the Petitioner claimed trial counsel said he was going to visit but failed to do so, vague letters of progress on the Petitioner's case sent by trial counsel to the Petitioner, trial counsel's last minute request for a continuance and motion to withdraw on the morning of trial, trial counsel's inadequate opening statement and broken promise during the same, trial counsel's failure to obtain Agent Craig's notes before trial, trial counsel's inadequate cross-examination of Investigator Etheridge, several instances during trial that are self-evident within the transcript, trial counsel's failure to comply with Rule 8 of the Rules of the Tennessee Supreme Court, and trial counsel's failure to ensure the trial court complied with Zagorski v. State, 983 S.W.2d 654 (Tenn. 1998).

A. In support of this claim, the Petitioner submits that trial counsel prioritized another client, Frank Murrell, over the Petitioner, when trial counsel told the Petitioner he was going to visit but failed to do so. We will address this issue in the conflict-of-interest section of this opinion.

B. We have reviewed the alleged "vague" letters of progress on the Petitioner's case sent by trial counsel to the Petitioner, and we do not consider them to be "vague" or grounds to establish that trial counsel failed to prepare in this case.

C. The Petitioner argues trial counsel's last-minute request for a continuance and motion to withdraw on the morning of trial substantiates his claim that trial counsel failed to prepare for trial. The Petitioner asserts that trial counsel knew he did not wish to pursue diminished capacity and deferred to the Petitioner until it was too late to present the evidence that trial counsel should have presented. Upon our review, the record shows that before the jury was sworn on the first day of the Petitioner's trial, trial counsel and the State

had a discussion in the trial judge's chambers without the Petitioner present. After jury selection was completed and the jury was sworn, the following exchange occurred:

THE COURT: We had a session in the office before jury selection this morning and [the Petitioner] was not present for that so we're going to kind of rehash what we did this morning. [The Petitioner], we're not trying to hide anything from you.

[TRIAL COUNSEL]: Your Honor, I can probably do that. What I had raised with the Court this morning is I had a conversation with [the Petitioner's] father who indicated to me that it was his concern that there might be a defense that would be available to his son, post-traumatic stress syndrome, and we talked about that. I had a brief conversation with [the Petitioner] . . . also about that.

With that in min[d], I approached the Court in chambers about my concern as to whether or not we ought to go forward or whether or not I ought to explore the possibility of that defense. [The Petitioner] has always taken the position that he is innocent, he didn't commit this crime, and he does not want me to assert that defense, but to protect the record and to make sure, I move the Court for a continuance to explore it.

From an ethical standpoint, I move the Court to be allowed to withdraw as his lawyer, to have someone else see whether or not that ought to be explored. It's – and [the Petitioner's] here, he's ready to – we've started. He does not want that asserted as a defense and that is not going to be a defense.

Am I stating that correctly, [the Petitioner]? Just answer so we'll –

[THE PETITIONER]: Yes.

[TRIAL COUNSEL]: So we're ready to go, Judge.

THE COURT: All right.

[THE STATE]: Your Honor, the only thing that I would say about that, as we pointed out to the Court, we had previously filed all of the motions and notices that are required by law to be notified -- use of experts -- filed a motion to compel on that and we've received no response on that. If they try to go down that path, if the Court on those -- we would rely upon those legal

motions and motion to compel that had previously been filed. There's been no objection to that. We may not have to go there but we'll ask the Court to take knowledge of the – what's in the file and the filings with the Court pretrial.

THE COURT: Well, as I stated in chambers this morning, I've known [trial counsel] a long time, I know he's a good lawyer, I know he totally advised his client, encouraged him to rely on a diminished capacity defense. His client, it's his case, he rejected [trial counsel's] counsel. [Trial counsel] will represent Mr. Gregory. He'll do a good job. I told [trial counsel] that in the event that he wanted to rely on the post-traumatic stress disorder that he could do it based upon the facts but could not call any expert because he had not given notice to the State. I've told [trial counsel] I believe the facts mean more to the jury than the expert could add in any event.

In his motion for new trial, trial counsel argued the Petitioner "was denied his right to a fair trial by the [trial] Court's refusal to grant a continuance to allow the [Petitioner] to properly assert as a defense posttraumatic stress syndrome." Trial counsel said that on the morning of trial "the [Petitioner] and the [Petitioner's] parents both indicated to me that they at that point wanted me to assert that defense. I asked the Court for a continuance for that purpose and that request was denied." In denying the motion, the trial court stated, in relevant part, that the motion to continue was raised on the morning of trial. Trial counsel asked for a continuance "at that time because apparently either his client or his client's family wanted to raise the mental defense." The court noted that the Petitioner and his family had "nearly two years if there was a possibility of a mental defense, the family and the client had allowed it, [trial counsel] could have developed it." The court denied this issue and explained, "to cause a continuance on the morning of trial the Court just felt was a delaying tactic."

At the evidentiary hearing, trial counsel said that on the morning of trial the Petitioner wanted to change the defense theory of the case, which was a surprise to trial counsel because the Petitioner had previously indicated he did not want to use the diminished capacity defense. Trial counsel said he needed more time to pursue the change in strategy by his client. The post-conviction court determined trial counsel was a credible witness and affirmed his statements that he was prepared for trial, did a lot of investigating, communicated with the Petitioner and his family, interviewed several people, considered various defenses, and hired an expert in this case. The court further credited trial counsel's reason for requesting a continuance and later moving to withdraw from the case on the morning of trial. We conclude that the record does not preponderate against the determination of the court. The Petitioner does not claim that trial counsel was ineffective in failing to present a mental health defense, and the transcript shows that on the morning

- 40 -

of trial, the Petitioner agreed with trial counsel's assessment of the case and wished to proceed with the trial. Accordingly, this does not substantiate the Petitioner's claim that trial counsel failed to prepare for trial based on his request for a continuance on the morning of trial. The Petitioner is not entitled to relief.

D. The Petitioner asserts trial counsel was ineffective in failing to prepare for trial based on trial counsel's inadequate opening statement and broken promise during the same. The purpose of an opening statement is to set forth each side's "respective contentions, views of the facts and theories of the lawsuit." Tenn. Code Ann. § 20-9-301 (2015). Tennessee courts have long held that misstatements and broken promises to the jury can amount to ineffective assistance of counsel. See State v. Taylor, 968 S.W.2d 900, 911-12 (Tenn. Crim. App. 1997). Regarding opening statements by defense counsel, this court said in State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991), that "[e]ither overstatement or misstatement during this presentation, despite curative efforts, may have adverse effects[.]" The court explained that counsel "should only inform the jury of the evidence that he is sure he can prove" and that counsel's "failure to keep [a] promise [to the jury] impairs his personal credibility." Id. (quoting McCloskey, Criminal Law Desk Book, § 1506(3)(O) (Matthew Bender, 1990)).

Trial counsel's opening statement to the jury was as follows:

[TRIAL COUNSEL]: Yes, sir. Good morning, ladies and gentlemen. One of the difficult things a defense attorney has to do is make an opening statement, for this reason: I may have a good idea of what the State's proof is going to be but I don't know exactly what it's going to be but I want you to be considering certain things when you hear the testimony.

This case will focus on Rachel Lucas as much as [the Petitioner]. You will hear evidence that, though they may have gone somewhere as a couple, that Mrs. Lucas was having an affair at the time of the murder. You will hear that Mrs. Lucas even lied to the prosecutor about having that affair. The evidence will show that Mrs. Lucas only admitted having the affair when she realized that the Defense knew about the affair. It's her deceit that I want you to keep as a background to the evidence, and I submit to you that when you've heard all the proof it'll be clear to you that this gentleman right here (pointing) is guilty of absolutely nothing. Thank you.

First, the Petitioner asserts the opening statement was "without direction" and "lacked effort." Even if true, this does not mean that counsel was not prepared for trial. Next, the Petitioner relies on King v. State, 989 S.W.2d 319, 331 (Tenn. 1999), for the proposition that trial counsel's failure to establish the truth of the above statements on

cross-examination of Rachel Lucas constitutes a broken promise to the jury. We disagree. This is not a situation where trial counsel promised the jury that the Petitioner would testify or that they would hear from a defense expert witness. Johnson v. State, 145 S.W.3d 97, 119 (Tenn. Crim. App. 2004). In context, the statements by trial counsel do not constitute a promise to the jury. Trial counsel prefaced his remarks about Rachel Lucas's testimony with the statement that he did not know exactly what the State's proof was going to be. In other words, trial counsel was anticipating the proof to show that Rachel Lucas had been deceitful. The record shows that trial counsel cross-examined her extensively regarding her affair with her paramour and weaved a seed of doubt based on her infidelity throughout the trial. Although he was unsuccessful at establishing Rachel Lucas was untruthful about the affair to the parties or when she disclosed the affair, this issue was thoroughly explored by trial counsel on cross-examination. This is more akin to the statements made by trial counsel in Ivy v. State, No. W2010-01844-CCA-R3-PD, 2012 WL 6681905, at *32 (Tenn. Crim. App. Dec. 21, 2012) (rejecting ineffective assistance of counsel claim based on a failed attempt to predict the introduction of evidence in an opening statement), and the Petitioner has failed to establish trial counsel was deficient or prejudice to his case.

E. The Petitioner asserts trial counsel was ineffective in failing to obtain Agent Craig's notes before trial, which would have provided Rachel Lucas's earliest narrative of the event. He argues the failure to obtain the notes deprived him of the ability to properly challenge Lucas's "evolving testimony[.]" We interpret this claim as a challenge to the adequacy of trial counsel's cross-examination of Rachel Lucas. The Petitioner claims the notes were also significant because (1) they did not mention any money being taken, which was raised only later in Agent Craig's affidavit; and (2) they contained three pages of information about Jacqueline Peek, including her account of the victim's involvement with "sex games, strip clubs, cocaine, and orgies[,]" which "could have led to other suspects." The record reflects that during Agent Craig's testimony at trial, trial counsel asked Agent Craig if he had taken a statement from Rachel Lucas on the day of the offense, and Agent Craig said yes. Agent Craig confirmed that he compiled a typewritten report from his interview notes with Rachel Lucas. Trial counsel retrieved the report, and questioned Agent Craig about various inconsistencies between Lucas's statement and her trial testimony. Trial counsel admitted the report as Exhibit 94.

At the evidentiary hearing, Agent Craig's handwritten notes were admitted into evidence; however, they were not discussed in any significant way. Trial counsel said he could not remember any reason for not requesting Agent Craig's notes, and he had no reason to believe that Agent Craig's notes differed from his other reports. We have reviewed trial counsel's cross-examination of Rachel Lucas at trial. It reflects several attempts by trial counsel to impeach Rachel Lucas based on inconsistencies in her trial testimony and her statement to Agent Craig. It also includes questioning about the photographs of the victim's wallet, and Rachel Lucas agreed that it appeared undisturbed.

Upon comparing Agent Craig's notes to Exhibit 94, we find no material difference. Exhibit 94 includes reference to the victim's wallet and that it was not unusual for the victim to have $500 cash in his wallet. Neither the notes nor Exhibit 94 make explicit mention of missing money. In this regard, trial counsel would not have gained any advantage by having Agent Craig's notes. The information from Jacqueline Peek about the victim would have been inadmissible, and given the Petitioner's confession to trial counsel, it would be unlikely trial counsel would have spent resources in search of other suspects. The Petitioner is not entitled to relief.

F. The Petitioner asserts trial counsel was ineffective in failing to prepare for trial based on trial counsel's inadequate cross-examination of Investigator John Ethridge regarding the drinking containers that were not recovered from the crime scene. We will address this issue in the section of this opinion challenging trial counsel's failure to object or request a jury instruction under Ferguson.

G. The Petitioner asserts trial counsel was ineffective in failing to prepare for trial based on trial counsel's attempts to submit a document regarding the Petitioner's Fifth Amendment rights at trial, trial counsel's announcement during the jury out hearing that he had not read the note found in the Petitioner's truck; and trial counsel's announcement during Agent Craig's testimony that he did not have a "clean copy" of a document he wished to enter into evidence because he had written on it. This supporting basis was not included in the petition, raised at the evidentiary hearing, or addressed in the post-conviction court order. Accordingly, it is waived. Waiver notwithstanding, none of these assertions, individually or collectively, show that trial counsel failed to prepare for trial under Strickland. The Petitioner is not entitled to relief.

H. The Petitioner asserts trial counsel was ineffective in failing to prepare for trial based on trial counsel's failure to comply with Rule 8 of the Rules of the Tennessee Supreme Court. Regardless of his confession of the crime to trial counsel, the Petitioner asserts that trial counsel was ethically required to permit and prepare the Petitioner to testify. This ground was not included in the petition, raised at the hearing, or addressed in the order of the court. It is therefore waived, and we decline to address it.

I. The Petitioner asserts trial counsel was ineffective in failing to protect his right to choice under Zagorski v. State, 983 S.W.2d 654 (Tenn. 1998). The post-conviction court rejected this claim reasoning that Zagorski does not apply to noncapital defendants. The Petitioner asserts that Zagorski has not been explicitly limited to capital defendants and urges this court to apply Zagorski in this case. Assuming without deciding that Zagorski applied in this context, the Petitioner would be unable to establish deficient performance or prejudice to his case. Our research has revealed no case in which Zagorski has been

extended to apply to a noncapital defendant. Trial counsel cannot be faulted for failing to follow legal authority that does not exist. The Petitioner is not entitled to relief.

4. The Petitioner contends he received ineffective assistance of counsel based on trial counsel's failure to investigate, call, or cross-examine key witnesses. In his brief, the Petitioner argues trial counsel was ineffective in failing to call Dr. Warren, Dr. Dickie Jackson, and in failing to cross-examine Chief Wayne Ellison. In regard to trial counsel's alleged failure to call Dr. Warren as a witness at trial, we will address whether trial counsel was ineffective in failing to call him as a ballistics expert in another section of this opinion. The Petitioner submits trial counsel was ineffective in failing to call Dr. Warren as an expert in crime scene reconstruction. At the evidentiary hearing, Dr. Warren testified extensively regarding perceived errors in how the investigators handled the crime scene. The Petitioner submits that Dr. Dickie Jackson could have testified as an expert witness regarding the time of the victim's death, contradicted the State's theory that the victim was awake and active when shot, and provided his observations of Rachel Lucas's behavior at the crime scene. Finally, the Petitioner submits that trial counsel was ineffective in failing to cross examine Chief Ellison's observation of Rachel Lucas's "odd" behavior at the crime scene. The post-conviction court credited trial counsel's testimony that if he did not call a witness to testify, it was because they would not have been helpful. The record does not preponderate against the determination of the court. The gravamen of Dr. Jackson and Chief Ellison's testimony was that the victim's body temperature was unknown, there were no defensive wounds on the victim's body, and Rachel Lucas's behavior may have been unusual three hours after the 911 call was made. In our view, the testimony of the above witnesses would have added minimal value to the Petitioner's defense. Accordingly, the Petitioner cannot establish deficient performance or prejudice to his case.

5. The Petitioner contends he received ineffective assistance of counsel based on trial counsel's failure to request a Ferguson instruction. The Petitioner asserts that law enforcement had a duty to preserve or collect three beverage containers, a fallen sconce, and a pen, and failed to do so. In Ferguson, 2 S.W.3d at 912, our supreme court addressed the issue of when a defendant is entitled to relief when the State has lost or destroyed evidence that was alleged to have been exculpatory. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Ferguson, 2 S.W.3d at 917. Ordinarily, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. However,

> "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value

- 44 -

that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Ferguson, 2 S.W.3d at 917 (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984). Evidence need not be clearly exculpatory; even evidence which has "tenuous" exculpatory value and which is "probably of marginal exculpatory value" may give rise to a duty to preserve, so long as it was material to the preparation of the defense and might have given rise to reasonable doubt regarding guilt. Id. at 918.

On numerous occasions, this court has held that a law enforcement officer's failure to collect certain items from a crime scene did not result in a Ferguson violation. See State v. Franklin, 585 S.W.3d 431, 461 (Tenn. Crim. App. 2019) (citing State v. Bargery, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *62-64 (Tenn. Crim. App. Oct. 6, 2017), no perm. app. filed (holding that the State's failure to collect a bloody towel, fruit punch cans, blood stain samples, and fingerprints did not violate Ferguson because the State had no duty to collect such items); State v. Hubbard, No. W2016-01521-CCA-R3-CD, 2017 WL 2472372, at *6-8 (Tenn. Crim. App. June 7, 2017), no perm. app. filed (concluding that the State did not have a duty to preserve surveillance footage from a crime scene when officers failed to collect the footage); State v. Bufford, No. W2013-00841-CCA-R3-CD, 2014 WL 2129526, at *12-13 (Tenn. Crim. App. May 20, 2014) (rejecting the defendant's claim that "the State should have collected more evidence because that evidence might have been exculpatory"); State v. Brock, 327 S.W.3d 645, 698-99 (Tenn. Crim. App. 2009) (holding that the State did not have a duty to collect fingerprint evidence and a bloody footprint from the crime scene); State v. Somerville, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730, at *4-5 (Tenn. Crim. App. Feb. 11, 2002) (concluding that the State did not have a duty to preserve surveillance footage from the scene of a Wal-Mart for a shoplifting charge when the State never had possession or control over the footage).

In concluding that the State's failure to collect evidence from a crime scene does not rise to the level of a Ferguson violation, this court has recognized that

the State is not required to investigate cases in any particular way: Due process does not require the police to conduct a particular type of investigation. Rather, the reliability of the evidence gathered by the police is tested in the crucible of a trial at which the defendant receives due process. Moreover, [i]t is not the duty of this Court to pass judgment regarding the investigative techniques used by law enforcement unless they violate specific statutory or constitutional mandates.

Brock, 327 S.W.3d at 698-99 (quoting State v. Best, No. E2007-00296-CCA-R3-CD, 2008 WL 4367529, at *13 (Tenn. Crim. App. Sept. 25, 2008)) (internal citations and quotation marks omitted).

At the evidentiary hearing, Agent Craig agreed that the items depicted in Exhibits 4A and B, the sconce, pen, and drink containers, were not collected as evidence from the crime scene. Agent Craig explained the reason the sconce was not collected from the crime scene was because it was not directly involved in this case, and there did not appear to have been a scuffle in the area where the sconce was found. Agent Craig did not collect the pen found on the floor, and he could not recall why the pen was not recovered or collected. There was no testimony regarding the beverage containers; however, Inv. Ethridge authenticated the photograph and confirmed that the items were recovered from the crime scene. Trial counsel said he did not request that these items be tested because he was "concerned of what the results would be." He did not lodge a Ferguson "objection" because he "didn't see any reason to" given his trial strategy and his experience dealing with Ferguson issues. The post-conviction court found trial counsel credible and credited his testimony that he did not request a Ferguson instruction because it was "unnecessary." The record supports the determination of the post-conviction court. Moreover, we conclude that the State did not have a duty to collect the sconce, pen, and drink containers from the crime scene; thus, there was no duty under Ferguson to preserve such evidence. Because a Ferguson objection or request for a jury instruction would have been unsuccessful, the Petitioner cannot demonstrate that trial counsel's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Accordingly, the Petitioner is not entitled to relief.

6. The Petitioner contends he received ineffective assistance of counsel based on trial counsel's failure to present a shooting incident reconstruction and a firearms expert. At trial, Agent Craig testified that "with a shotgun, there is no ballistic match," and he submitted the ballistics evidence to the TBI to be examined for primer strikes or marks on the shot shells and to determine the garment-to-muzzle distance. Agent Brodhag testified, in relevant part, regarding four shot shells-one set of shot shells that was recovered from the Petitioner's home and another set that was recovered from the Peek home. Agent Brodhag testified that all of the shot shells were fired from the shotgun recovered from the Petitioner's truck. He also said the set of shot shells from the Petitioner's home contained No. 6 shot size and the set of shot shells from the Peek home contained No. 7 -½ shot and No. 6 shot. Agent Brodhag confirmed that the pellets he received which were recovered from the victim were consistent with No. 6 shot and that the 12-gauge shells recovered from the Petitioner's truck were No. 6 shot. On cross-examination, trial counsel was able to get Agent Brodhag to agree that examining a shotgun and shotgun pellets are different. Agent Brodhag agreed that he could not determine whether the pellets recovered from the victim were fired from the Petitioner's shotgun.

At the evidentiary hearing, trial counsel said he did not employ a firearms expert because he "knew exactly what the answer was going to be when I asked it." He did not need to hire an expert to say that he could not determine that the pellets taken from the victim's body were fired from the gun, which is what Special Agent Brodhag testified to. Trial counsel also did not need an expert to testify regarding trajectory because his defense was that the Petitioner was not there and trajectory did not have "any value." Trial counsel had experience with the State's firearm experts and was confident he could elicit the information he needed for his defense. He did not believe he needed a "crime scene expert" because he went to the crime scene, reviewed it, and spoke with various individuals. Dr. Warren testified and did not dispute Agent Brodhag's ballistic report and conclusions. Instead, Dr. Warren believed the "significance of [Agent Brodhag's analysis] was not communicated at trial because of a lack of that defense expert." Dr. Warren's concern was that there was no direct or scientific evidence of when and where that shotgun fired the shot shells. The post-conviction court framed the issue as trial counsel's "fail[ure] to review the entire TBI ballistics case as well as not calling an expert witness on this issue." The court credited the testimony of trial counsel who said he was able to elicit the evidence he wanted for the Petitioner regarding the TBI Ballistics Report from Agent Brodhag and that he did not need to hire an expert because it was not a part of his defense strategy. The record does not preponderate against the determination of the post-conviction court. This case did not hinge on expert ballistic testimony nor was there any direct or explicit ballistic evidence linking the Petitioner to the offense. See e.g., Kendrick v. State, 454 S.W.3d 450, 470-471 (Tenn. 2015) (defense counsel did not perform deficiently in a murder prosecution by failing to find and present a firearms expert to testify that the trigger mechanism in defendant's rifle was defective, even though defense counsel presented a defense theory of accidental firing of the rifle; the best evidence that defendant's rifle was capable of misfiring was the undisputed fact that crime-scene investigator was shot in the foot by the very same rifle, defense counsel had a reasonable basis to believe that investigator would testify that he had not touched the trigger, and the case did not hinge on expert testimony, as the bulk of the state's case consisted of eyewitnesses). Moreover, based on the Petitioner's confession to killing the victim, the Petitioner ignores trial counsel's testimony that an expert may have revealed inculpatory evidence. Under these circumstances, we conclude that trial counsel's decision not to hire an expert was reasonable, and the Petitioner is not entitled to relief.

7. The Petitioner contends he received ineffective assistance of counsel based on trial counsel's failure to ensure the Petitioner could hear during trial. He claims that he made trial counsel aware pretrial that he had a hearing disability, which he acquired during his twenty-six years in the military. Despite informing trial counsel pretrial of his hearing disability, the Petitioner was not provided with the necessary hearing devices until after the voir dire and after the testimony of five State's witnesses. He argues he had no opportunity

to give advice or make suggestions to trial counsel during voir dire. The question of whether trial counsel was ineffective in failing to ensure adequate accommodation for a deaf or hearing-impaired defendant appears to be one of first impression in Tennessee. But see Bounnam v. State, No. W2001-02603-CCA-R3PC, 2002 WL 31852865, at *7 (Tenn. Crim. App. Dec. 20, 2002) (rejecting ineffective assistance claim based on trial counsel's failure to hire interpreter because it was "obvious" the defendant could understand and communicate in English).

Both the United States Constitution and the Tennessee Constitution guarantee a defendant the fundamental right to be present at his or her own trial. U.S. Const. amend. V, XIV, § 1; Tenn. Const. art. I, § 9; see State v. Muse, 967 S.W.2d 764, 766 (Tenn. 1998). This right to be present applies to the arraignment, every stage of the trial including the impaneling of the jury and return of a verdict, and the imposition of a sentence. Tenn. R. Crim. P. 43(a)(1)-(3). Other states that have considered this issue have recognized:

> The Sixth Amendment guarantees that '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *.' The confrontation clause requires that a defendant be given the opportunity to be physically present at trial, that the defendant be competent to assist in his own defense, and that the defendant understand the language of the forum. A defendant who cannot hear is analogous to a defendant who cannot understand English, and a severely hearing-impaired defendant cannot be tried without adopting reasonable measures to accommodate his or her disability.

Com. v. Walls, 993 A.2d 289, 297 (Pa. 2010) (citing Com. v. Wallace, 641 A.2d 321, 325 (Pa. 1994)); see also Ferrell v. Estelle, 568 F.2d 1128, 1132 (5th Cir. 1978) vacated as moot, 573 F.2d 867 (5th Cir. 1978); People v. Rivera, 480 N.Y.S.2d 426, 433-434 (N.Y. App. Div. 1984); Peeler v. State, 750 S.W.2d 687, 688-91 (Mo. Ct. App. 1988) (reversing denial of post-conviction relief reasoning trial counsel ineffective for failing to request the services of an interpreter).

In State v. Staples, 437 A.2d 266, 267 (N.H. 1981), the Supreme Court of New Hampshire reversed a defendant's conviction and granted a new trial on grounds that trial counsel had been ineffective for failing to take action to compensate for the defendant's inability to hear testimony during his trial. The court relied on Drope v. Missouri, 420 U.S. 162, 171, 95 S. Ct. 896, 903 (1975) and found that a defendant who is mentally deficient is analogous to a defendant with a hearing impairment. The court also reasoned:

> The ABA Standards for the Defense Function admonish defense attorneys to "inform the accused of his rights . . . and take all necessary action

- 48 -

to vindicate such rights." ABA Standards for Criminal Justice s 4-3.6, at 4.45 (2d ed. 1980). The authors caution that counsel must often take "special steps" to protect the accused, id., commentary to s 4-3.6 at 4.46, which may include ordering medical examinations of the accused. Id. In this case, no steps were taken prior to trial, and those that were taken during trial were inadequate.

Staples, 437 A.2d at 268.

During the motion to suppress hearing, the Petitioner asked the parties to "speak up," and trial counsel then advised the trial court that "Your Honor, if I could, just so everyone will know, the [Petitioner] is hard of hearing and I will just ask everyone to kind of speak up a little bit." The court replied, "I am, too, [Petitioner]." At trial, during the testimony of the first State witness, Stacie Edwards, trial counsel interjected and asked the court if "the witness [could] speak up just a little, [the Petitioner's] hard of hearing." The court responded, "You're a teacher, I know you can talk louder than that." And the witness replied, "Yes, sir." The prosecutor then explained, "One of the things that happens, [witness], is that people think the microphones in the courtroom amplify, they don't, they're for the court reporter. They do pick up but they don't amplify so we -- speak up." After five pages of transcript, the prosecutor asks the witness to speak up again. She was asked to speak up three more times in her testimony. Jerry Matney, another neighbor, testified without issue. Jessica Lanier, a witness present at the Thompson's One Stop on the morning of the offense, began her testimony and was instructed to speak up twice. Linda Moore, Lanier's mother and another store employee, testified and was instructed to speak up. Nicole Reeves, a witness who gave the Petitioner his tear-drop tattoo, testified without issue.

After Reeves testimony, trial counsel requested a jury out hearing, and the following colloquy occurred:

[TRIAL COUNSEL]: Your Honor, I'll tell the Court where we are because I had this come up in Hickman County. We've gone a day and a half trying to have witnesses speak loud enough. It's not working. The [Petitioner] has a hearing impairment, and like I did in my case in Hickman County, I'm going to ask under the case law, not the disabilities Act, we're going to have to provide him with some hearing assistance through the use of headphones. I mean, you know, I hate to delay – I've had this happen – I've had this happen in Hickman County and it's not going to work. Telling the witnesses to speak up is not going to work and we're going to have to – we're going to have to make some arrangements so this man can hear his own first-degree murder trial. I can't keep -- I can't try this case trying to interpret for him.

- 49 -

THE COURT: You-all got any equipment?

[THE STATE]: Judge, I don't have the headphone situation but I do have a situation -- we don't have our microphones with us. Mr. Ethridge could go get them. I can't go the route that [trial counsel's] suggesting to -- for him to have headphones but I could go -- I think I could get us an amplification process. I've already got a speaker set up in here, it'll just be a matter of turning it around, I guess, and we could amplify. We were prepared because of -- in the -- in the presentation of the case we have the 911 telephone conversation that we're going to under the -- with permission of the Court, of course, exhibit it as a -- play for the jury so we sort of -- sort of anticipate that, so it's just a matter of getting a -- something to amplify -- a microphone to run through the system. We've got wireless microphones. We've got two of those so we could do that. I don't know, this is the first it's been brought to my attention other than the few comments that have been made. I doubt if the [Petitioner's] having any difficulty hearing the attorney. But we could set up one for the witness and one for the -- at the podium, I guess, if that's of some assistance. First I've ever had it in my short career to deal with that so that's the best quick solution I've got.

THE COURT: Well, he ought to be able to hear the lawyers, if not, we can tell the lawyers to speak up. The witnesses are a problem.

[TRIAL COUNSEL]: I can hear the lawyers, it's the witness.

THE COURT: Where is your equipment, Charlotte?

[THE STATE]: Yes, sir. If there's something local, I'm not aware -- I just don't know what's available to the Court or whether there's some amplification system that's available here.

THE COURT: I don't know. We don't have anything, do we?

THE CLERK: Not that I know of.

THE COURT: Who's your next witness?

[THE STATE]: Mr. Gantlett.

SHERIFF DAVIS: Your Honor, if I may, I may have access to a system.

- 50 -

THE COURT: Check and find out, Sheriff, if you don't mind.

The transcript reflects that the sheriff left the courtroom to check on equipment to aid the Petitioner in hearing the witnesses. Upon his return, the following exchange occurred:

THE COURT: [Petitioner], can you hear that pretty good (tapping on the microphone at the witness stand)?

[THE PETITIONER]: I can hear that pretty good.

THE COURT: Let's go ahead and proceed and get Mr. Gantlett in here. We'll get him up close to the microphone. He said he could hear it so we'll see.

Tim Gantlett, Pam Gunn, Ms. Dodd, and Scott Dodd testified without issue. Four introductory questions into the next witness's testimony, Nicole Heath, the 911 dispatch operator, trial counsel stated, "Judge, I don't know if our system's working. We can't hear." In response, the court stated, "I turned this one off yesterday. I don't know if anybody's turned it back on so let's see. How about now?" To which the Petitioner replied, "Yes." The witness then resumed her testimony, without issue.

At the evidentiary hearing, which occurred eleven years after the Petitioner's trial, trial counsel recalled that the Petitioner did not indicate that he had a hearing problem before trial and that he first became aware the Petitioner had difficulty hearing at trial. When the Petitioner said he could not hear, the trial judge stopped the proceeding, addressed the Petitioner, and ensured the courtroom was set up with "amplification devices" so the Petitioner could hear. Trial counsel conducted a Momon hearing with the Petitioner at the trial, and the Petitioner waived his right to testify. At the Momon hearing, the Petitioner was aided with hearing amplification and, according to trial counsel, was able to hear and understand the proceeding. Trial counsel stated that the Petitioner did not inform him that he could not hear. The Petitioner testified that he had hearing aids at his residence (after the arrest), but that his family or he could not find them. The post-conviction court credited the testimony of trial counsel that "as soon as he was aware that the [Petitioner] had a hearing issue in court, he addressed it with the trial judge." We agree with the Petitioner that the record preponderates against the factual determination that trial counsel did not become aware of the Petitioner's hearing impairment until trial. The record shows that trial counsel began his effort to ensure the Petitioner could hear as early as the motion to suppress.

- 51 -

We are nevertheless not persuaded that trial counsel failed to ensure the Petitioner could hear at trial. The Petitioner confines his complaint to not being present during voir dire and the first five trial witnesses. He argues that he was unable to participate in voir dire based on 93 references to "inaudible" in the voir dire transcript. However, a fair reading of the references to inaudible are in response to questions posed to the entire venire and did not necessitate a recorded verbal response from each individual juror. These references are not indicative of the Petitioner's inability to hear. Next, although the Petitioner exhibited a CD with over a thousand pages of his VA medical records, the pages he directs us to in his brief provide that the Petitioner "is a hearing aid candidate," and there was no proof that the Petitioner relied exclusively on hearing aids to hear. Even so, the record shows that trial counsel took affirmative steps to ensure the Petitioner could hear at trial. As early as the first witness, trial counsel urged the court to instruct the witnesses to speak up. Upon being told that the Petitioner could not hear and trial counsel could not continue to repeat the testimony for him, the trial court equipped the court with speakers or microphones to amplify the witness testimony. The Petitioner was twice asked if he could hear, and he responded that he could. Under these circumstances, the Petitioner has failed to demonstrate trial counsel was deficient or prejudice to his defense. He is not entitled to relief.

8. The Petitioner contends he received ineffective assistance of counsel based on trial counsel's failure to secure the presence of the Petitioner and Jacqueline Peek for a court-ordered deposition and for failing to comply with Tenn. R. Crim. P. 15. The Petitioner does not explain the import of the deposition and claims only that trial counsel was ineffective in securing his presence there. To be clear, Jacqueline Peek testified at trial, and there was no deposition admitted at trial. At the evidentiary hearing, the parties did not dispute that the trial court had ordered the deposition of Jacqueline Peek. However, trial counsel stated that had there been a deposition of Jacqueline Peek, he would have ensured the Petitioner's presence at said deposition. Trial counsel said there was never a deposition of Jacqueline Peek. Trial counsel was certain of this because trial counsel would have been present had it occurred, and he did not attend one. A March 23, 2011 letter from trial counsel to the Petitioner was admitted as an exhibit and stated, in relevant part, "We were right. Her lawyer has intervened so there will be no deposition." Investigator Ethridge also testified that there was no deposition of Jacqueline Peek in Hickman County. Agent Craig did not have any documentation in his case file or notes indicating that a deposition had occurred. Jacqueline Peek testified that she remembered answering questions from the district attorney in a Nashville office, but she could not provide many specifics on the event (other than having her attorney present). The post-conviction court credited the testimony of trial counsel. The record does not preponderate against the court's determination. Accordingly, the Petitioner is not entitled to relief.

9. The Petitioner contends he received ineffective assistance of counsel because trial counsel provided the jury with Exhibit 94, which as previously discussed was Agent Craig's report of Rachel Lucas's statement. The Petitioner asserts Exhibit 94 contained inflammatory information about the Petitioner. The portion of the report at issue is a reference to someone telling Rachel Lucas that the Petitioner had been "high," and that the victim told Lucas that, "if [the Petitioner] ever calls them again, tell him that they have plans, stating that '[the Petitioner's] on drugs and could steal from us.'" The report was admitted at trial during the cross-examination of Agent Craig and after the testimony of Rachel Lucas. Trial counsel later explained that the purpose of admitting the report was to show the jury the TBI's interview procedure and for the jury to see Rachel Lucas's statement, which was different than her trial testimony. At the evidentiary hearing, upon being shown trial Exhibit 94, trial counsel agreed that it showed that the Petitioner was on drugs in the days leading up to the offense. Trial counsel agreed that Exhibit 94 had some negative aspects, but he believed that it also had positive aspects that reinforced their defense strategy. The post-conviction court accredited the testimony of trial counsel. The record does not preponderate against the determination of the court. Moreover, the proof at trial showed that marijuana or leafy plant material and other drug paraphernalia were recovered from the Petitioner's truck, and his DNA was found on a marijuana cigarette recovered from outside the victim's home. Although we agree that the report contained inadmissible references to the Petitioner being on drugs, given the evidence adduced in this case, we are unable to conclude that trial counsel's admission of Exhibit 94 was prejudicial to the defense. The Petitioner is not entitled to relief.

II. The Petitioner argues that trial counsel had a conflict of interest based on his representation of Frank Murrell and based on his land transaction with Michelle Herbison. In support, the Petitioner asserts that trial counsel's failure to disclose his connection to these two potential witnesses violated Model Rule 1.7 of the ABA Model Rules of Professional Conduct and that trial counsel's divided loyalties adversely affected his performance in this case. Citing Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980), and Netters v. State, 957 S.W.2d 844, 847 (Tenn. Crim. App. 1997), the Petitioner insists this court must presume prejudice. We disagree. The record shows that Frank Murrell and Michelle Herbison were included on trial counsel's witness list. However, neither Murrell nor Herbison testified at trial. At the evidentiary hearing, trial counsel agreed that he represented Murrell for entry of his guilty plea in federal court on the Friday before the Petitioner's trial. Trial counsel explained Murrell did not know anything about the Petitioner's case other than he had been a gardener or a landscaper at the victim's property. Trial counsel said Murrell was of "no value" and on the witness list "just in case." He also explained that the land transaction with Herbison was in exchange for another unrelated legal matter and was temporary. The post-conviction court credited trial counsel's testimony that the witnesses were on the witness list "just to appease the [Petitioner][,]" and would not have been helpful. The Petitioner offered no proof to the contrary. The

post-conviction court determined that the Petitioner failed to carry his burden of proof, and we agree. From the Petitioner's brief, we discern his primary complaint to be that trial counsel prioritized his own interest or that of his other clients over his representation of the Petitioner. This alleged conflict of interest is not the type of conflict to which Cuyler applies. See State v. King, 703 S.W.3d 738, 782 (Tenn. Crim. App. 2024); Mathews v. State, No. M2017-01802-CCA-R3-PC, 2019 WL 7212603, at *24 (Tenn. Crim. App. Dec. 27, 2019). Moreover, there was no testimony concerning the amount of time trial counsel dedicated to the Petitioner's case weighed against the time he spent on his other clients. An attorney's representation of two otherwise unrelated clients, without more, fails to demonstrate an active conflict of interest that adversely affected their performance before or during a defendant's trial. Accordingly, applying Strickland, the Petitioner has failed to establish deficient performance or prejudice to his case. He is not entitled to relief.

III. Finally, the Petitioner argues he is entitled to relief based on the cumulative error doctrine. The cumulative error doctrine is a "judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). The cumulative error doctrine only applies when there has been more than one error committed during the trial proceedings. Id. at 77. Given that the Petitioner established just a single instance of trial counsel's deficient performance, there is no cumulative effect to consider. Accordingly, the Petitioner is not entitled to relief.

## CONCLUSION

Based on the above reasoning and authority, we affirm the judgment of the post-conviction court.

s/ Camille R. McMullen

CAMILLE R. MCMULLEN, PRESIDING JUDGE